## THE WILLIAM BRANFOOT.

### HAMILTON *v.* THE WILLIAM BRANFOOT.

*(District Court, D. South Carolina. January 15, 1892.)*

1. SHIPPING—LIABILITY FOR PERSONAL INJURIES—DEFECTIVE APPLIANCES.
   A ship is liable in damages to one of a stevedore's gang who is injured while unloading cargo by the unexpected falling of a stanchion because of defects in the fastening not observed by him, and not apparent to the eye.

2. MEASURE OF DAMAGES—PERSONAL INJURIES.
   By an accident on a vessel, for which the ship was liable, a stevedore's laborer received a comminuted fracture of the bones of his leg, and had his leg amputated below the knee, being treated in a free hospital. He was between 30 and 35 years old, and earned $1.25 a day, or $375 a year. *Held,* that he would be allowed $500 for sufferings, and it would be assumed that his earning capacity was reduced two-thirds, and that his life-interest in the capitalized value of his income was worth one-half the amount thereof, on which theory he was entitled to recover $1,786, or $2,286 in all.

In Admiralty. Libel by John Hamilton against the British steamship William Branfoot for damages for personal injuries. Decree for libelant.

*Northrop & Memminger,* for libelant.

*Trenholm & Rhett,* for respondent.

SIMONTON, J. This libel is for personal injuries received on shipboard. Libelant was one of a stevedore's gang employed in discharging pyrites from the British steam-ship William Branfoot. While he and others were working in the lower hold, an iron stanchion supporting the between-decks fell and broke his leg. Amputation became necessary. The leg was cut off about six inches below the knee. The stanchion was on the starboard side of the main hatchway, midway. It was 18 feet high, and weighed 660 pounds. It rested on an iron tank at the bottom of the hold, and had two flanges at its lower end, through each of which was an iron bolt, riveting it to the tank. The top of the stanchion was riveted to the iron beam, upon which the between-decks rested. This was by a sort of flap pierced with two holes for rivets. After the stanchion had fallen, its upper end was examined. The concurrence of testimony is that one of the rivets originally in this part of

the stanchion had broken off, and disappeared. At all events, it was not in place at the time of the accident. The other was worn,—presented the appearance of an old break, which extended, some say one-half, others two-thirds, through the rivet. There is great divergence of testimony as to the bolts at the base of the stanchion. Libelant's witnesses say that they exhibited old breaks. Those for claimant say that one exhibited a fresh break throughout. The other may have been broken in part. The stanchion fell without warning, unexpectedly. The discharge of cargo was by means of a patented automatic. A rope was passed over a crane some 50 feet above the vessel, to the end of which was attached, by hooks, an iron bucket, weighing about 400 pounds. The bucket was let down into the hold; was disengaged from the hook by one man, who had no other duty but to disengage the buckets as they came down, and to put on the hoooks when they were loaded; was rolled on its wheels to the cargo; was loaded by the other hands, rolled back under the hatch, and attached to the hooks. Loaded, it weighed 2,700 pounds. Upon signal the steam-hoisting apparatus was set in motion. The tub moved up slowly at first, then very rapidly, traversing the distance up in 10 seconds. The theory of the claimant is that the hooks had been attached to a full tub before it got under the hatchway, and that the hoisting apparatus was prematurely set in motion. The heavy tub, thus dragged along the bottom of the hold, was dashed against this stanchion, tearing it from its rivets, and causing it to fall. For this negligence upon the part of the gang the ship is not liable; the stevedore having been selected and engaged by the charterer. There were several eye-witnesses to the accident,—the foreman of the stevedore, who personally superintended the gang; the man in the hold, whose duty it was to unhook and hook the buckets; the man on deck at the hatchway, whose duty it was to give the signal to the engineer of the steam hoist; and the men in the gang in the hold. All of these swear that the tub did not strike the stanchion. On the other side there is but one person who was at the place of the accident when it occurred. He did not see the tub, but just at the time he heard a noise which he concluded was caused by a blow of the tub on the stanchion. All the rest of the claimant's testimony on this point is theory. The positive evidence does not support it. The conclusions of fact are: The libelant, lawfully at work in the hold of this vessel, was injured by the unexpected fall of the stanchion; that it fell because of defective fastenings, certainly at its upper end, probably at its base, also; that these fastenings had become worn and broken from wear and tear, and were possibly originally imperfect. These defects were not visible except in one respect,—the absence of one upper rivet.

This action is for negligence,—the absence of that care which it was the duty of the respondent to use. It proceeds upon the idea that there existed an obligation upon the part of the respondent to libelant to use care, and of a breach of this obligation to the injury of the libelant. Such an obligation did exist in this case. Cooley, Torts, p. 550; *Gerity* v. *The Kate Cann*, 2 Fed. Rep. 241. Libelant has proved the fall-

ing of a stanchion of the vessel, the cause of injury to him, the insecurity of some of its fastenings, and that this insecurity was not immediately perceptible. Does this require respondents to prove care on their part? When an unusual and unexpected accident happens, and the thing causing the accident is in one's exclusive management, possession, or control, the accident speaks for itself, is itself a witness. *Res ipsa loquitur.* And, in a suit by any one having an action therefor, the fact of the accident puts on the defendant the duty of showing that it was not occasioned by negligence on his part. *Kearney* v. *Railroad Co.*, L. R. 5 Q. B. 411; on appeal, L. R. 6 Q. B. 759; approved in *Gleeson* v. *Railroad Co.*, 140 U. S. 449, 11 Sup. Ct. Rep. 859. In *Scott* v. *Docks Co.*, 10 Jur. (N. S.) 1108, on appeal, 3 Hurl. & C. 596, the court say:

"There must be reasonable evidence of negligence. But when the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the action arose from want of care."

In *Transportation Co.* v. *Downer*, 11 Wall. 134, this case is approved. In *Mullen* v. *St. John*, 57 N. Y. 568:

"When plaintiff proved that the building fell into the street, and injured her, she had made out a case, in the absence of any explanation on the part of the defendants, as buildings do not usually or necessarily fall; and that it is for the jury to say, under all the evidence, whether that explanation on the part of the defendants is reasonably made."

The rule is thus stated in 1 Add. Torts, § 33:

"When the accident is one which would not, in all probability, happen, if the person causing it was using due care, and the actual machine causing the accident is solely under the management of defendant, * * * the mere occurrence of the accident is sufficient *prima facie* proof of negligence to impose upon the defendant the *onus* of rebutting it."

In our case the respondent rests on the theory that the blow of the bucket caused the fall of the stanchion. There is no evidence of any inspection of the stanchion at any time by any one. The mate speaks of a cursory examination made by him at some undefined time. This cannot be called an inspection. It is very clear that neither the master nor the mate had any suspicion that one of the rivets on the upper end of the stanchion had disappeared. There is no evidence whatever as to what care was exercised, if any care was exercised at all. The witnesses, it is true, speak of a board lashed to this stanchion about midway in its height, and to a stationary iron ladder leading into the hold. If this was done because of some weakness discovered in the stanchion, the liability of the respondent would be fixed, both because this betrays knowledge of the defect and the very insufficient means taken to correct it.

The ship must respond in damages. The amount of damages is the next question. Libelant is an able-bodied man between 30 and 35 years of age, a laborer, earning, when he has work, $1.25 per day. He has been in a public hospital,—a free patient. That he suffered pain goes without say-

ing. He had a compound comminuted fracture of the lower bones of his leg. He must be compensated for his pain, and for his impaired capacity for labor. He is by no means helpless, or unable to make a living. Counsel for libelant press upon the consideration of the court tables, prepared by insurance agents, showing the expectancy of life at various ages,— 35 years if libelant is 30, and 32 years if he is 35,—and ask that he be allowed the sum of his daily wages for this period. This would be securing for libelant compensation for a certain period when we are dealing with the most uncertain thing in the world,—human life. I have no confidence in, and less respect for, these tables made up by insurance agents, in which, of course, large allowance must be made for heavy commissions, expenses, and profit. Nor can any safe guide be had from decided cases. Circumstances in each case sway the minds of judges as well as jurors. We can compensate him for his pain. Following Mr. Justice BRADLEY in *Miller* v. *The W. G. Hewes*, 1 Woods, 367, I allow him $500. His disability is for life, but for life only. Assuming—and it is beyond the mark—that he can get for every working day $1.25, his income would be $375 per annum. This would be the income at 7 per cent. on a capital of $5,357. But, as he would be entitled to such income only for his life, a decree giving him this sum in fee would clearly be improper. In South Carolina (*Wright* v. *Jennings*, 1 Bailey, 277) the value of the life-estate as compared with the fee is as 1 to 2; that is, ½. The one-half of $5,357 is $2,678. This would be the award were the libelant rendered absolutely helpless and incapable of work. But his capacity to labor is diminished, not destroyed. Assume that it is diminished two-thirds. Allot him two-thirds of $2,678; that is, $1,786. Let a decree be entered for libelant in $2,286, and costs.