## STEEL et al. v. McNEIL.

(Circuit Court of Appeals, Fifth Circuit. January 23, 1894.)

#### No. 163.

SHIPPING—INJURY TO STEVEDORE'S EMPLOYE—DEFECTIVE APPARATUS.

A ship is liable for injuries caused to a stevedore's employe by the slipping of the pin from the eye of a shackle furnished and rigged by the crew, because of defects therein noticed and pointed out to the mate

by one of the stevedore's men, although the shackle was so rigged while the heavy hoisting apparatus prepared by the ship was being exchanged for a lighter gear insisted upon by the stevedore, and arranged in a manner directed by him; it appearing that such arrangement required no unusual strength of materials, and that the substitution was not unreasonable, in view of the fact that the original apparatus was much heavier and more cumbrous to handle than was required by the work in hand. 56 Fed. 241, affirmed.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

This was a libel filed by Hugh McNeil against the steamship Para, of which Steel, Young & Co. are claimants, to recover damages for injuries sustained while working on board as one of a stevedore's gang. There was a decree in his favor for $5,000, (56 Fed. 241,) and the claimants appeal.

This is an appeal from the decision of the district court for the eastern district of Louisiana in a suit in admiralty brought against the steamship Para for personal injury received by libelant while working on board that vessel, in a stevedore gang, discharging cargo, and alleged to have been caused by the defect and insufficiency of a shackle,—one of the appliances furnished by the ship for the performance of such labor. The ship arrived at the wharf in New Orleans on the morning of July 2, 1890, at about 1 o'clock. Arrangements had been made with a stevedore—whose foreman, with his men, were at the wharf upon arrival—to receive her, and prepare for discharging cargo. There is a conflict of testimony whether or not there was any derrick or boom up at the time of her arrival, for hoisting the cargo; the witnesses for the vessel claiming that the vessel was fully rigged for that purpose, with iron blocks, and a chain fall passing through an iron hoisting block at the end of the boom, thence to a leading block (also iron) made fast to the mast, thence to the winch, while the witnesses for libelant state that no such apparatus was rigged, but that the boom was lying on the iron rests. The rigging arranged that way, whether up or not, was not satisfactory to the stevedore, as it required an extra hand at the guy to haul each sling load of cargo over the vessel's side as it was hoisted from the hold, and was a heavy gear fitted for hoisting several tons, while the cargo to be discharged was light; and he insisted upon having the hoisting gear rigged with a rope fall leading from the winch through a block at the mast, thence through one made fast to a ring bolt in the starboard side of the deck, thence to the hoisting block at the head of the derrick. The effect of this arrangement was to permit the cargo, when hoisted from the hold, to swing to the starboard side by its own weight, and the slacking of the guy on the port side. In putting up this hoisting gear, the stevedore furnished the large blocks, but the ship furnished the guys, falls, shackles, winch, and all other materials. The putting up, rigging, and getting all the gear ready was done by the ship's boatswain and crew, under charge of the chief officer or first mate. In doing this it was necessary to use a shackle at the heel of the derrick or boom to secure the block through which the rope passed to the mast. This shackle was furnished by the ship, put in place by the boatswain and two of the crew. It was a shackle with a pin which passed through an eye at one side, and was supposed to screw firmly into a socket in the other. The libelant was winchman, and, when at work, stood a few feet from the heel of the derrick, nearly in a line between the winch and the block upon the starboard side. Upon the afternoon of the second day the pin of the shackle worked loose, the shackle spread so that the block became free, flew, and struck libelant on the head, fracturing his skull, breaking his collar bone, and causing other injuries of a serious and permanent character. Upon a hearing in the court below, a judgment was given for libelant in the sum of $5,000, from which decree an appeal has been taken by claimants of the vessel.

J. McConnell & Son, for claimants.

Henry L. Lazarus and Peter Stifft, for libelant.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

LOCKE, District Judge, (after stating the facts.) The law is too well established to require argument that a vessel is bound to furnish rigging and appliances reasonably safe for the use of those employed in receiving or discharging her cargo, although they may be in the immediate employ and pay of the stevedore, and that an action in rem will lie for damages arising from defects and imperfections in such appliances furnished, whenever the defect was such that a careful examination at the time could have detected it. The Carolina, 30 Fed. 199; The Rheola, 19 Fed. 926; The William Branfoot, 48 Fed. 914; The Protos, Id. 919; The Serapis, 49 Fed. 393.

In this case, it is not disputed that the shackle which finally gave way was furnished by the steamship, and was put in its place, and fitted and prepared for use, by its crew; but it is claimed in defense that it was in good condition when furnished and delivered to the stevedore's gang, and that it was through their neglect that it was permitted to give way. It is also claimed that the manner of rigging the hoisting apparatus as insisted upon by the stevedore brought an unusual strain upon the shackle, that caused it to give way, and that on account of such arrangement the course of the block which struck the libelant was changed from what it would have been, so that he was injured, when otherwise he would not have been, even had the shackle parted with a different manner of rigging. The testimony as to whether the usual hoisting rigging of the ship was in place upon her arrival, and so tendered to the stevedore, is conflicting; the officers of the ship stating that it was, but some of them modifying their statements by saying that it generally was rigged before coming into port, or was usually so, while the stevedore's men deny that the rigging was up, but declare the derrick boom was resting upon the stand. But we do not consider this an important question in the case. It is clearly shown that the manner of rigging was at the request of the stevedore, and was insisted upon by his men. It appears that the second mate protested against the change, but, when told that they would go to the captain and get an order to have it done, he yielded. We do not consider that the stevedore and those working under him assume the risk of any imperfect or faulty appliance which was furnished by the ship because arranged in a peculiar manner insisted upon by him, when such manner is not unreasonable, nor requiring unusual and extraordinary strength of material. It is strongly contended that, had not this manner of rigging been adopted, this disaster would not have occurred; and with equal force may it be urged that it would not have occurred, had hand or horse power been used for hoisting, instead of steam. But that cannot, we consider, relieve the vessel from the responsibility

of furnishing reasonably good and sufficient means to perform the work. The testimony is that the rigging tendered by the ship was a chain and iron blocks, heavy, and capable of hoisting from three to four tons. The cargo to be discharged demanded no greater strength at any time than sufficient to hoist about 800 pounds. The stevedore said that he wanted a lighter rigging, and we do not consider it unreasonable for him to endeavor to avoid, if possible, the swinging of the heavy derrick and chain rigging back and forth by hand, and unnecessarily using the chain hoisting fall in the hold. In regard to the condition of the shackle when furnished by the ship, it is in testimony that its appearance was such before they went to work that it attracted the attention of one of the stevedore's men,—the derrick man in charge of the hatch,—who spoke to the mate about it, and complained that the bolt of the shackle did not go through, but that the mate examined it, and said that it was all right,—to go ahead, —and that after they had been at work he again remarked that it looked as if the bolt was drawing out, but that the mate again assured him that it was all right. There is nothing to deny or contradict these statements, although the mate says that he saw the shackle properly screwed in; and, in the light of future occurrences, we must consider that there was at that time some defect, which, although not enough to justify one in refusing to work, should have been recognized, had a more careful scrutiny, and been corrected.

From the testimony in the case, and the appearance of the shackle as presented, it is plain that there was a defect in the threads of the screw of the shackle bolt, which permitted it to work loose, and that the strain upon the bolt when the end had escaped from the socket was sufficient to twist it into its present shape. It is impossible for us to arrive at any other conclusion, from an examination of it. Nor do we consider that there was any extraordinary, unusual, or unreasonable strain brought to bear upon the shackle by the manner of rigging insisted upon by the stevedore, which in any way contributed to the negligence which caused the damage. The shackle is shown to have been capable, in its perfect condition, of sustaining certainly many times as much weight as was put upon it at any time during this service. The only additional strain that could have been caused by using it with three blocks, instead of two, was the increased friction of the extra leading block, and the variation of the direction of the strain from directly aft was but a few degrees to the starboard, as is plainly shown in the photograph in evidence. Neither of these conditions, it is believed, could have been sufficient to cause the pin to work out, with the strain that was upon it, had it been securely and completely screwed into its place. If it were screwed in, as is stated in the testimony, with a marline spike, the subsequent events conclusively show, we consider, that there must have been at that time some obstacle which prevented its being screwed well home, as it should have been.

Questions of fact, in admiralty, cannot, at all times, be determined beyond a possibility of doubt; but in this case we consider, by a careful examination of the shackle and the photographs of the hoisting gear, as presented, and the entire testimony in the case, that the probabilities, beyond a reasonable doubt, are that the spread of the shackle was so great, either on account of the thickness of the eye on the mast hoop to which the shackle was made fast, or some other cause, that the pin was insufficient in length for its thread to hold firmly in the socket, where it was intended. In the photograph presented, the shackle bolt distinctly appears, projecting some distance beyond the socket in which it is firmly held. Had there been such a bolt to this shackle, we are confident no disaster would have happened. It is contended that there was a jerking motion caused by the third block which tended to loosen the pin of the shackle. The entire force of the hoisting gear came from the winch, and such force producing the strain could have been no more irregular, uneven, or jerking with three blocks than with the two. The manner of rigging appears to be, under the circumstances found in this case, one usual and customary in this port, and a more rapid and economical way of discharging cargoes; and we find no ground for considering it unreasonable, or requiring extraordinary or unusual strength in the appliances used. No disaster resulted from the same manner of rigging at any of the other hatches, nor would there have been here, had not the pin withdrawn from the socket into which it should have been more securely fastened. The testimony shows that at first there was an appearance of an insufficient security of the bolt; and its final coming out, and permitting the escape of the block, shows that such appearance was not without foundation. Whether or not the block would have struck the winchman, had the appliances given way with some different manner of arrangement, we do not consider has any weight in this case. The shackle was furnished, fitted, and arranged by the ship, and, after a small amount of ordinary service, gave way. There was no latent or hidden defect, or sudden and unforeseen breaking, as of a rope or hook apparently sound, strong, and sufficient; and the prima facie case made for the libelant we do not consider has been at all overcome or explained away by the evidence for appellant. It is certain that, had there been no defect in the shackle in question, or in the manner of its being made fast, the damage which we are considering would not have been caused. In furnishing such defective appliance, or so insecurely fastening it, there must have been such negligence as should make the vessel liable.

We have examined and considered the testimony as to the former and present condition of the libelant, his ability to earn a livelihood previous to the injury and since, and do not consider the damages allowed by the court below unreasonable nor excessive. But it appears that for a long time after filing the libel there was no prosecution of the suit, taking of testimony, or seeking for a trial, and we do not consider that interest should be com-

puted until the decree. The judgment below should be so far amended as to allow interest from the final decree in the court below, rather than from the date of judicial demand; and in all other things the judgment of the court below should be affirmed, with costs herein, and it is so ordered.