THE WYNERIC.

(District Court, D. Oregon.   October 7, 1907.)

No. 4,878.

1. SHIPPING—INJURY TO STEVEDORE'S EMPLOYÉ—LIABILITY OF VESSEL.
    The liability of a vessel for an injury to an employé of a stevedore
    while working on the vessel does not depend upon any contractual rela-
    tion between the vessel or owner and the employé, but, where it exists,
    rests upon the breach of some implied duty to exercise due care as to the
    condition of the vessel and appliances which might affect the safety of
    persons necessarily employed to work thereon.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 349–
351.]

2. SAME—UNSAFE PLACE TO WORK.
    Under a charter party requiring the vessel to be furnished with clear
    holds for receiving cargo and in every way fitted for the service, it was
    the owner's duty to render her safe for workmen to enter her holds, and
    to there perform the services ordinarily required in loading and stowing
    the cargo, and the vessel is liable to a stevedore employed by the char-
    terer for an injury received by him while stowing cargo in a dark water
    ballast tank from the falling upon him of loose planks which had in
    some manner caught in the beams at the top of the tank, probably when
    it was full of water, and were negligently permitted to remain there.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 349–
351.]

In Admiralty.

Giltner & Sewall, for libelant.

Williams, Wood & Linthicum, for claimant.

WOLVERTON, District Judge.   A libel to recover for personal
injuries received by libelant while at work stowing lumber in a water
ballast tank in the lower hold of the ship Wyneric. Libelant was in
the employ of Brown & McCabe, stevedores, who were under con-
tract with the Pacific Export Lumber Company, charterer of the ship,
to load her.   The charter party represents the ship as being "ready,
with clear holds, to receive cargo, and tight, staunch, strong, and in
every way fitted for the service, having water ballast," etc.   On the
day of the accident giving rise to the libel, namely, October 4, 1906,
libelant had gone into the tank with Holm, another employé of Brown
& McCabe, and the two together had stowed two slings of lumber,
so called from the manner in which the lumber was lowered, and,
while carrying a timber 3 by 12 inches and 20 feet in length, and placing
it in stowage, two planks fell from above, and struck libelant upon
the head, causing the injury of which he complains.   The tank is de-
scribed as being 41 feet in length, 18 feet in width at the forward end,
and 10 at the other, and from 10 to 12 feet in depth.   The hatchway,
in dimensions five feet square, is in the corner of the tank.   The libelant
was carrying the end of the timber farthest from the hatchway, and
had proceeded aft along the tank partition to the corner when he was
hurt.   He testified:

"I stooped myself down, and the plank was about a foot from the floor
when I dropped it; and, as soon as I dropped the plank, two plank came down

on me when I stooped over. The first one knocked an inch and a half hole on my head, and the second one came across my back."

On cross-examination he says:

"Yes; I did put down a 3 by 12, just easing it down, when it came on top of me, those two planks. Q. And Holm was at the other end of that stick? A. Yes."

Andrew Holm, the man who was assisting libelant, corroborates him in the main, but not in detail, being unable to see libelant plainly from where he was. He says that the fall of the planks knocked libelant senseless, but that he came to in about five minutes, and witness helped him out. The libelant states, however, that he ascended the ladders to the upper deck without assistance. The men, finding the light admitted through the hatches insufficient for doing their work conveniently, were furnished with two candles, which were being used at the time; but with these the tank was yet illy lighted.

The tank was provided with a wooden floor, and, from the testimony of the officers of the ship, it appears that two of the planks thereof had been missing for some time, and had not previously been located. In further detail, it appears that the tank contained stanchions running up and down the sides thereof, and iron beams across the top, leaving a space between the beams and the top. The boatswain, being examined as to the possibility of loose boards getting caught above these beams by floating in above them while the tank was full of water, testifies as follows:

"Q. Isn't there an angle bar running over the tank just below the top of the tank and the tank? An iron beam running there? A. Yes, sir; there is beams running right over the tanks. Q. And it is possible for loose boards to get caught up there, isn't it? A. Between them? Q. Between the beams and the top of the tank, isn't there room for them to get caught? A. Yes, sir; but they are made to fit. * * * Q. It is possible to put some planks between the beam that runs across the top of the tank and the tank, isn't it—between the space where sticks could be put in? A. Yes, sir; if you would put them in. Q. And if they should be loose at the bottom they might fall in there and get caught? A. There is nothing to catch on. Q. There is a space, isn't there, between the top of the tank and the beams? A. Yes, sir. Q. Now, if they got caught in there? A. Yes, sir; they would come out the same way they come in. They wouldn't stick. Q. Isn't it possible they might stay there? A. It may be possible."

The boatswain testifies, further, that on the forenoon preceding the accident he, with three men, went into the tank and cleaned it out; that it was necessary to sweep it down upon the sides and the top because of the slime and rust that would accumulate from the action of the water; that his men were at work in each tank perhaps half an hour; and that they discovered nothing of the plank in question while employed in cleaning out the tank.

As it respects the extent of the injury, libelant testifies that he went to his employer at once after he was hurt, and was sent to Dr. Wheeler, who sewed up and dressed the wound upon his head, but did not examine his back, although he informed the doctor that it was hurt also. This was on the 4th of October. On the 11th or 12th of the same month he went to Dr. Sewall, who, with the assistance of Dr. Tilzer, examined him for injury to the spine. These physicians found no evi-

dence of pain from pressure upon the vertebræ, but a tenderness was discovered in the lumbar region, and, when required to stoop, it was ascertained that libelant favored his back, and hence it was concluded that he had sustained a sprain of the ligaments in· the locality designated. It was thought the effect upon the nervous system would be very temporary. When asked whether he thought the injury was permanent, Dr. Sewall answered:

"I do not. Just as I told you in respect to a sprain, it isn't as good as it was before it was sprained. * * * I mean a ligament, after it has been stretched, is not as good as it was before it was stretched."

Dr. Wheeler testifies that he examined libelant the day he was hurt, and found that there was a slight contusion, the scalp was cut, and that, on further examination, he found a slight abrasion on the left shoulder, apparently where the plank had grazed· him, and that the patient made no complaint of his back. Libelant was requested to call again on the next day or the day following, but he never returned.

This résumé sets forth in practical effect the facts attending the controversy. The first question presented is whether the ship is liable at all, the libelant being in the employ of Brown & McCabe, stevedores, who were contractors with the charterer for loading and stowing the cargo.

It is argued by proctors for respondent that there were no contractual relations existing between libelant and respondent, and that, by reason thereof, respondent could not be held liable for the injury sustained. The question is not a new one, so that we are not without precedent for its determination. A ship's liability for tort of the kind does not depend, as is supposed, upon any express contractual relations existing between the craft, or its owner or master, and the party injured. If it was a matter of duty which it owed to the libelant not to be negligent concerning the condition that conduced to libelant's injury, other relations, whether contractual or not, may be dispensed with. Wallace, J., in discussing a cause analogous in its controlling feature, says:

"Nor did the relation of master and servant, in its technical sense, exist between the libelant and the shipowner. But it is conceived that this does not in the least affect the obligation of the master not to be negligent towards the libelant, or the degree of care which it was incumbent upon him to exercise. The libelant was performing a service in which the shipowners had an interest, and which they contemplated would be performed by the use of appliances which they had agreed to provide. They were under the same obligation to him not to expose him to unnecessary danger that they were under to the master stevedore, his employer. There was no express contract obligation on their part to either to provide safe and suitable appliances, but they were under an implied duty to each; and the measure of the duty towards each was the same." The Rheola (C. C.) 19 Fed. 926, 927.

To the same purpose, see The Para (D. C.) 56 Fed. 241. The doctrine was applied in another case (Gerrity v. Bark Kate·Cann [D. C.] 2 Fed. 241), the facts of which come very near to those out of which the present controversy arises. The Kate Cann was under charter to receive and transport a cargo of grain. The libelant was engaged in turning the grain as it came into the elevator. He was hurt by the fall of dunnage that had been carelessly and insecurely stowed by the

ship's crew in the between decks upon braces overhead, and it was determined that the ship was liable. The court says:

"This neglect was the neglect of a maritime duty, and attaches to the ship herself. Not only did the neglect occur upon navigable water, but in the performance of a service necessary to be performed to enable the ship to receive her cargo. The stowing of this dunnage was part of the ordinary duty of the ship's crew, and in this case was done by the crew. The object of stowing the dunnage was to facilitate the taking in of the very cargo upon which the libelant was employed at the time he was hurt. Still, further, the dunnage and plank that, by reason of neglect in the manner of stowing, fell upon the libelant, were part of the apparel and furniture of the ship."

A like view was entertained in a later case, wherein it appears that a stanchion, which was defective in its fastenings, fell and injured one of the stevedore's gang. The William Branfoot (D. C.) 48 Fed. 914. This case is affirmed by the Court of Appeals, by an opinion written by Mr. Chief Justice Fuller. See 52 Fed. 390, 3 C. C. A. 155.

In the present case the charter party obligates the owners to furnish the ship with clear holds, and in every way fitted for the service. This means, as construed by Mr. Wheelwright, she shall be put in a condition fit in every way to receive her cargo. It was the owner's duty, therefore, to render her safe for workmen to enter her hold, or any compartment thereof, and there to perform the services ordinarily required of them in loading and stowing cargo. From this duty springs liability for any injury, arising from the negligence of the owner or crew, that may be sustained by persons lawfully engaged in the stowage of cargo within her hold. And it is not always essential that direct or specific contractual relations exist between the libelant and the ship or her owners. It is evident to my mind that the planks that did the injury became in some manner clogged between the beams and the covering of the tank, while floating in the water, so that they were held insecurely in position. And they must have remained there for some time, as they were missing from the floor for a considerable time anterior to the accident. True, it is in evidence that the boatswain, with three men, cleaned out the tank immediately before the libelant entered for stowing the lumber, and that nothing was discovered of the planks. But it is hardly possible, if a careful inspection had been made, that they should have been overlooked. They were nearly half the length of the tank, and the height of the tank was not so great but that they could have been readily detected above. There was either carelessness, therefore, in making the inspection and in cleaning out and fitting the tank for receiving cargo, or else the planks were discovered and negligently allowed to remain in their position without determining whether they were secure or safe. I say one of these alternatives must be true, because there is no doubt that the planks were lodged overhead, as otherwise they could not have fallen upon the libelant. That they fell without any apparent cause and injured libelant is a fact beyond controversy. This is not a case of res ipsa loquitur, but there is evidence pertinent to fix the liability and responsibility. The planks were out of their place in the floor. They fell from above, where they ought not to have been, and their position while above ought, by reasonable care and prudence, to have been located prior to

the injury, and they taken down or made secure and safe if it was desired that they should remain there.

This leaves for determination the amount of the recovery. The contusion upon libelant's head healed readily, and has left no ill effects; and I am not convinced that the injury to the ligaments about the lumbar region of his back was of permanent character. It is probable he did not complain of his back to Dr. Wheeler, and it was a week before he had any examination made thereof. The physicians who examined him then discovered nothing of a serious nature. He was probably disabled from doing the heavy work of a stevedore for a while, but he could have pursued a lighter occupation any time after the accident. He was earning from $4.10 to $4.20 per day, and I will allow him $100 for loss of wages (which is for nearly a month's time) and $200 additional for the pain and suffering endured. The aggregate recovery will therefore be $300.