Fuller, Circuit Justice,
(after stating the facts.) Treating the opinion of the learned district judge as if it formally presented findings of fact and conclusions of law separately stated, claimant assigns upon his appeal a number of alleged errors in respect of such findings and conclusions, and these have been fully argued by counsel. The real question is whether, upon the whole case, the district court erred in rendering the decree complained of; but in-determining that question the opinion of the court may be considered, by way of convenience, in the light of claimant’s objections, as these embody the grounds relied on as requiring a reversal, and involve an examination of the entire record.
The district judge said:
“Libelant was one of a stevedore’s gang employed in discharging pyrites from the British steamship William Branfoot. While he and others were working in the lower hold, an iron stanchion supporting the between decks fell and broke his leg. Amputation became necessary. The leg was cut off about six inches below the knee. The stanchion was on the starboard side of the main hatchway, midway. It was eighteen feet high, and weighed six hundred and sixty pounds. It rested on an iron tank at the bottom of the hold, and had two flanges at its lower end, through each of which was an iron bolt, riveting it to the tank. The top of the stanchion was riveted to the iron beam upon which the between decks rested. This was by a sort of flap, pierced with two holes for rivets. After the stanchion had fallen, its upper end was examined. The concurrence of testimony is that one of the rivets originally in this part of the stanchion had broken off and disappeared. At all events, it was not in place at the time of the accident. The other was worn,—presented the appearance of an old- break, which extended, some say one half, others two thirds, through the rivet. There is great divergence of testimony as to the bolts at the base of the stanchion. Libelant's witnesses say that they exhibited old breaks. Those for claimant say that one exhibited a fresh break throughout. The other may have been broken in part. The stanchion fell without warning,—unexpectedly.”
In our judgment the record entirely bears out the correctness of the foregoing statement, and it may be added in this connection that there was also evidence tending to show the working of the ship on the bolt that remained at the top, as well as that it had an old break in it; that the two bolts at the bottom of the stanchion had been broken for more than a month, or long before the vessel commenced her voyage; that *392 stanchions frequently required repairs, being injured by the cargoes; and that it further appeared that a board had been lashed to the stanchion about midway in its height, and to a stationary iron ladder leading into the hold, manifestly before the pyrites were loaded, thereby steadying the stanchion, at least until the cargo was withdrawn. The district court was justified in concluding that—
“The libelant, lawfully at work in the hold of this vessel, was injured by the unexpected fall of the stanchion; that it fell because of defective fastenings, certainly at its upper end, probably at its base also; that these fastenings had become worn and broken from wear and tear, and were possibly originally imperfect. ”
The court further said:
“These defects were not visible except in one respect,—the absence of one upper rivet. * * * Libelant has proved the falling of a stanchion of the vessel, the cause of injury to him, the insecurity of some of its fastenings, and that this insecurity was not immediately perceptible. * * * There is no evidence of any inspection of the stanchion at any time by any one. The mate speaks of a cursory examination made by him at some undefined time. This cannot be called an inspection. It is very clear that neither the master nor the mate had any suspicion that one of the rivets on the upper end of the stanchion had disappeared. There is no evidence whatever as to what care was exercised, if any care was exercised at all.”
Here again we concur with the views of the district judge thus expressed. There is no basis for the theory that Hamilton voluntarily assumed the risk of danger from an insecurity known to him, nor, on the other hand, is the position sustained by the evidence that that insecurity was unknown to libelee, or such as should not reasonably have been within his knowledge. The stanchion was one of some ten or twelve. The mate, in answer to the question whether he had ever made an examination of the top part of this stanchion, testified:
“I never made an examination of the tops of the stanchions particularly. When I have been down in the holds, seeing and getting the holds ready for cargo, everything seemed to be all right then. They are seventeen or eighteen feet from the floor to the top. Question. So your examination consisted in standing at the bottom of the stanchion, and looking up casually? Answer. Yes. Q. Have you examined the other stanchions in the hold? A. Just the same way.”
The district court was quite right in holding that this was no proof of an inspection, and that none such was had, and we think it clear that a proper examination would not simply have disclosed the absence of one of the upper rivets, in itself a serious element of weakness, but also the fact that there were other defects which rendered the condition of the stanchion dangerous. It is true that the floor of the ship covered the flanges of the stanchion and the bolts fastening them to the tank; but the tests of an inspection are not merely those of eyesight, and, although the absence of rivets at the bottom of the stanchion may have been concealed, it must be assumed that whether the stanchion was secure or insecure could have been discovered without involving tearing up the deck to ascertain, in the first instance, the exact defects which *393 existed. Taking the evidence together, the reasonable inference is that not only would an inspection have disclosed the defective condition of the stanchion, but that that condition was probably known to those having the vessel in charge. If known, or if knowledge were chargeable, the duty to repair was obvious.
The defense that the stanchion was wrenched from its fastenings by negligence on the part of the stevedore in handling the hoisting machinery is thus set forth in the opinion:
“The discharge of cargo was by means of a patented automatic. A rope was passed over a crane some fifty feet above the vessel, to the end of which was attached, by hooks, an iron bucket, weighing about four hundred pounds. The bucket was let down into the hold; was disengaged from the hook by one man, who had no other duty but to disengage the buckets as they came down and to put on the hooks when they were loaded; was rolled on its wheels to the cargo; was loaded by the other hands, rolled back under the hatch, and attached to the hooks. Loaded, it weighed twenty-seven hundred pounds. Upon signal the steam hoisting apparatus was set m motion. The tub moved up slowly at first, then very rapidly; traversing the distance up in ten seconds. The theory of the claimant is that the hooks had been attached to a full tub before it got under the hatchway, and that the hoisting apparatus was prematurely set in motion. The heavy tub, thus dragged along the bottom of the hold, was dashed against this stanchion, tearing it from its rivets, and causing it to fail. Tor this negligence upon the part of the gang the ship is not liable, the stevedore having been selected and engaged by the charterer. ”
But the district judge held that the positive evidence was to the effect that the tub did not strike the stanchion, and we agree with him that there was substantial no testimony that the stanchion fell because of a particular blow of the bucket. It is urged, however, that it does appear that it was a frequent occurrence for the tubs to strike, and that this was the cause of the insufficiency of the stanchion’s supports. While there is some conflict upon this branch of the case, we are of opinion that the evidence falls far short of establishing, or even creating a presumption, that the defective condition of the stanchion was the result of external force continuously applied in the process of unloading, and that not only the stanchion did not fall from the blow of the tub, but also that the defective condition of its fastenings was not attributable to carelessness in handling the tubs prior to the fall. We perceive no reason for the exoneration of the ship, in any view which can properly be taken of the evidence in this regard. The cargo consisted of some 2,200 or 2,300 tons of pyrites in bulk, of which 200 tons were in hold No. 4, and 2,000 and upwards in holds Nos. 2 and 3; 1,000 to 1,100 tons being in hold No. 2, in which this stanchion was located. At the time of the accident the discharge of the cargo was nearly completed, and the men were working upon about 100 tons remaining in this hold to be removed. We cannot resist the conviction that the fastenings of the stanchion were so insufficient that when the support afforded by the cargo was withdrawn some slight vibration, occurring in the ordinary sequence of events, changed its center of gravity and occasioned its fall. Libelant occupied the position of a .person invited to *394 come upon the ship for the purposes of business, and was entitled to be protected from harm by the exercise of such care and prudence as would render the premises reasonably safe. There existed an obligation on the part of libelee to use such care, and a breach of that obligation was clearly made out when the defective condition of the stanchion, as the cause of the accident, was shown; and the surrounding circumstances, as disclosed, justified the inference either that that condition was known or might have been ascertained by the exercise of due care.
It is contended, however, that whether the whole case showed the breach of a legal duty on the part of libelee was a question not considered by the district judge, because it is said that he was controlled by an erroneous application of the doctrine of res ipsa loquitur. If this were so, it might overcome the weight which is usually conceded to the judgment of the lower court upon questions of fact; a principle, however, to which we have not adverted. Among other things the learned district judge observed:
“Libelant has proved the falling of a stanchion of the vessel, (the cause of injury to him,) the insecurity of some of its fastenings, and that this insecurity was not immediately perceptible. Does this require respondents to prove care on their part? When an unusual and unexpected accident happens, and the thing causing the accident is in one’s exclusive management, possession, or control, the accident speaks for itself, is itself a witness, res ipsa loquitur; and, in a suit by any one having an action therefor, the fact of the accident puts on the defendant the duty of showing that it was not occasioned by negligence on his part.”
A large number of cases in which that doctrine was expounded and applied were then cited, but it was said that the case of libelee “rests on the theory that the blow of the bucket caused the fall of the stanchion;” and the court proceeded to comment on the absence of any inspection, and the evidence indicating libelee’s knowledge of the defective condition o'f the stanchion, or culpable negligence in remaining in ignorance of it. It is plain that in his judgment a prima facie case was made out, not simply from the mere happening of the accident, but because the surrounding circumstances raised the presumption that it happened in consequence of a failure of duty on the part of libelee. Undoubtedly there are cases where the very nature of an accident has been held of itself to supply the proof of negligence, but the conclusion was not rested on the mere naked, isolated fact of injury. The presumption of negligence was drawn from the fact of the injury, coupled with the circumstances surrounding its infliction, and characterizing the nature of the occurrence as attributable to want of the requisite care, or as demanding an explanation which the defendant alone could furnish.
In Coasting Co. v. Tolson, 139 U. S. 552, 554, 11 Sup. Ct. Rep. 653, where the plaintiff brought his action for injuries resulting from the striking of a steamboat against a landing wharf, Mr. Justice Gray, delivering the opinion of the court, said:
“The whole effect of the instruction in question, as applied to the case before the jury, was that if the steamboat, on a calm day and in smooth water, was thrown with such force against a wharf, properly built, as to tear up *395 some of the planks of the flooring, this would be prima, facie evidence of negligence on the part of the defendant’s agents in making the landing, unless upon the whole evidence in the ease this prima facie evidence was rebutted. As such damage to a wharf is not ordinarily done by a steamboat under control of her officers and carefully managed by them, evidence that such damage was done in this ease was prima facie, and, if unexplained, sufficient, evidence of negligence on their part, and the jury might properly be so instructed. ”
Applying here the rule thus laid down, there is no difficulty in the premises, and we are not only satisfied, upon a consideration of the whole case, with the result reached, but that the conclusions of the district judge were arrived at in like manner, unrestricted by any erroneous application by him of the rule of presumption in question.
Upon the cross appeal libelant insists that the court erred in not awarding greater damages, and in overruling libelant’s exceptions to the taxation of costs. The learned district judge awarded a total amount of $2,286 for the pain and suffering undergone by libelant, and the permanent diminution in his capacity for labor. Without discussing the reasoning of the court in fixing the amount, we are of opinion that the award was just, under the circumstances, and should not be disturbed.
Libelant excepted to the disallowance by the clerk in his taxation of costs of seven items, five of them being charges for expert testimony.. As to two of these, the district court sustained the clerk, upon the ground that the witnesses did not come within the designation of experts, and, as to the other three, because the compensation of “ experts ” called by the party in his own behalf cannot be taxed against the losing party as costs or as extra allowances and disbursements, under the statute. Rev. St. §§ 823, 983.
We think the court was right, and that, as these charges, including expenses and disbursements, were not incurred under any action of the court, but by the party in the preparation and presentation of his own side of the case, the items were properly disallowed. Another item was for money paid for a copy of the official stenographer’s notes, obtained for libelant by his counsel. This was simply for convenience, and not a copy necessarily obtained for use on the trial. The item was properly rejected. The remaining item was for the expenses of a journey to New York, for the purpose of attending the examination of witnesses for libelee, the notice being so short that libelant insists that there was not sufficient time allowed within which to employ and instruct counsel in New York, and that it therefore became necessary that his proctor should be present in person. The district court correctly held that this was not a necessary disbursement, as, “if the notice given was unreasonable, counsel could have had the time extended,—perhaps have suppressed the deposition.”
The decree should be affirmed, at the costs of libelee, except the costs upon the cross appeal, which should be paid by libelant; and it is so ordered.