THE TRESCO.

(District Court, E. D. Pennsylvania. March 19, 1904.)

No. 67.

1. SHIPPING—DISCHARGE—INJURIES TO SERVANT—DEFECTIVE APPLIANCES—ASSUMPTION OF RISK.

Where a wire cable used in discharging a ship was carefully examined before the work was begun, and no defect was discovered, and the only sign of danger, consisting of strands or ends of wire sticking out from the splice, was observed solely by libelant and other workmen after the work of discharging the vessel had been in progress for 30 hours, but was not communicated or brought to the knowledge of any officer of the ship, and no request was made to have the defect remedied, libelant assumed the risk thereof.

2. SAME—NEGLIGENCE—INSPECTION.

A ship had received a new cable, of foreign manufacture, from a sister ship. It had been used but once before, when it was inspected by the ship's officer before being. used in discharging the cargo in question. The cable was bound around an iron thimble or eye, and the end, after surrounding the eye, was woven into the body of the rope, and the splice covered with tarred spun yarn. The cable had a capacity of 10 tons, and was used in lifting buckets of ore weighing between 1,800 and 2,000 pounds. Work was begun with the cable, which lifted the buckets safely for 30 hours after its first inspection, and no sign of weakness appeared until two or three hours before the splice pulled out by reason of which plaintiff was injured. *Held*, that the ship was not negligent in its inspection of the cable, in failing to take off the yarn and examine the splice.

3. SAME—"RES IPSA LOQUITUR."

Where a laborer engaged in discharging a ship was injured by the pulling out of a cable splice, the happening of the accident was not sufficient to raise a presumption of negligence, under the maxim of "Res ipsa loquitur."

**In Admiralty.**

Joseph Hill Brinton, for libelant.

Convers & Kirlin, Henry R. Edmunds, and John M. Woolsey, for claimant.

J. B. McPHERSON, District Judge.   Early in December, 1902, a cargo of iron ore was being unloaded from the steamship Tresco, lying in the port of Philadelphia, by Morris Boney, a master stevedore.   The ship supplied a wire rope, 2¾ inches in circumference, and steam for the winch.   The libelant was a laborer in Boney's employ, and was at work in No. 3 hold, helping to load the large iron buckets that were used in hoisting the ore.   Unloading had begun about 4 o'clock in the afternoon of the day before the libelant was injured, and the work was being prosecuted without intermission. About 11 o'clock at night, as one of the buckets, full of ore—the combined weight being from 1,800 to 2,000 pounds—was being drawn up from the hold, the wire rope, to which the bucket was attached by a chain and shackle, gave way.   The bucket was overturned in its fall, and part of its contents was thrown against the libelant, thus doing the injuries complained of.   The rope was bent around an iron thimble or eye, and the end, after surrounding the eye, was woven into the body of the rope;   the splice extending about a foot above the top of the eye.   So much of the rope as surrounded the eye, as well as the splice itself, was served with tarred spun yarn, which covered the splice completely.   The accident happened by the pulling out of the splice, and the libel complains of its condition in the following language:

"That the said wire cable was supplied by the respondents for the uses to which it was applied, and was known by them to be in an old, weak, defective, and unsuitable condition for the said purposes; that the fall aforesaid had on a prior occasion parted, and had been defectively spliced by the respondents and at the time aforesaid again parted at the place of said splicing."

There was no evidence, however, of a previous parting of the rope, and upon the hearing the libelant shifted his ground without amending the libel—although his failure to amend is not complained of— and relied upon the respondent's failure to inspect the rope properly before the work of unloading began.   Upon this point the facts are as follows:   The rope was brought to New York from the other side of the Atlantic—there is no evidence by whom it was made, or in what country—and was delivered to the Tresco in August by a sister ship belonging to the same owner.   It was then new, and was used only once by the respondent before the accident in question. Upon that occasion it was employed in discharging a cargo at Baltimore, and there is no evidence that it proved insufficient or showed any signs of weakness there.   Before the laborers began to take out the ore in Philadelphia, the first mate of the Tresco examined the rope carefully, and nothing was found to indicate that it was unsafe. The serving covered the splice, and was not removed, since there was no external sign to suggest that the rope might be unable to do its work.   A wire rope of this size should lift at least 10 tons.   Several times after the hoisting began, the mate again examined the

rope—the last inspection being about 4 o'clock in the afternoon preceding the accident—and found nothing that should have put him on his guard. The libelant and one of his witnesses testified that some time after this hour—apparently about 8 or 9 o'clock—they noticed strands or ends of wire sticking out from the splice, but they did not report this fact to any one; and went on with the work as usual; the libelant explaining his failure to speak of the matter by saying, "I didn't, because I thought it was spliced in a decent way, and tucked in so it would not part."

These being the facts, I am unable to see upon what ground the libelant can recover. The testimony goes to prove that the only sign of danger—assuming the appearance of the strands, or ends, to be such a sign—was observed by the libelant and other workmen alone, and that they did not communicate their knowledge to any officer of the ship, and ask to have the defect remedied. Perhaps they did not know themselves that danger was indicated, and, if this is true, the case is one of unfortunate but unavoidable accident, for which neither the libelant nor the ship is to blame. But if they did know or suspect that the condition of the rope might be unsatisfactory, and continued to work without objection and without asking to have the defect made right, they took the risk of injury, and recovery cannot be allowed. Upon the other question, also—failure to inspect properly—I think the libelant's case has not been made out. No doubt, the accident shows that the rope must have been defectively spliced. Indeed, one witness testified, as an expert, that the rope had not been spliced at all, but that the end had been bent around the eye, and then merely tied to the body of the rope with tarred yarn. This opinion was based upon an examination of the end after the accident, and seems to me to be incredible. Such a fastening could not have been mistaken for a splice; its shape would differ noticeably; and, as all the other witnesses on both sides speak of the rope as spliced, I can entertain no doubt upon the subject. But the work had evidently not been thoroughly done. The accident establishes that fact, for a good splice is as strong as any other part of a rope, and, as already stated, a wire rope of this size should bear a strain of at least 10 tons. But, although the break may prove that the manufacturer was negligent, it does not prove the negligence of the ship at all. The ship's duty was simply proper inspection, and the libelant was bound to prove that this duty had been neglected. Here I think he failed completely. There was nothing to put the ship on notice that the splice was probably unsafe. The rope was new; it had been used only once in discharging cargo, and had then proved efficient; and no outward sign indicated weakness. Under such circumstances, I do not think that the mate was bound to take off the serving and examine the naked wire with minuteness. And, even if he had done this, it may well be doubted whether anything suspicious would have been disclosed, for the rope lifted the buckets safely for 30 hours after the first inspection, and no sign of weakness appeared until, at the earliest, two or three hours before it parted.

The legal rules which govern cases of this kind are well known. This is not a situation that calls for the application of the maxim,

"Res ipsa loquitur," and therefore no presumption of negligence arises from the mere happening of the injury. The burden of proof is on the libelant to offer evidence from which the inference of the ship's negligence may be satisfactorily drawn, and negligence consists in the failure to perform the duty of proper inspection. I am satisfied that there was no such failure here, and therefore that on both the grounds already stated the libelant must be denied the right to recover. Neptune Steam Navigation Co. v. Borkman, 118 Fed. 420, 55 C. C. A. 548, is clearly distinguishable from the present case. There the fall that parted was rusted, and had been made from an old hawser. The court held that such a fall was not within the class of appliances to which the rule concerning latent defects applies. But the rope now in question was new, apparently in good condition, and had been safely used only a short time before. The duty of the employer is thus laid down in The France, 59 Fed. 479, 8 C. C. A. 185:

"An employer does not undertake absolutely with his employés for the sufficiency or safety of the appliances furnished for their work. He does undertake to use all reasonable care and prudence to provide them with appliances reasonably safe and suitable. His obligation towards them is satisfied by the exercise of a reasonable diligence in this behalf. Before he can be made responsible for an injury to an employé inflicted by an appliance adequate and suitable, ordinarily, for the work to be performed with it, there must be satisfactory evidence that it was defective at the time, and that he knew, or ought to have known, of the defect. The decision in the court below proceeded upon the ground that negligence was to be presumed from the circumstances of the accident. In his opinion the learned judge said:

" 'The evidence does not show anything out of the usual course that should cause the handle of the ash bag to break while it was hoisting up. Its weak and insufficient condition must be inferred from its breaking under such circumstances. I cannot regard the general testimony that the bag was sound and sufficient as overcoming that fact.'

"The presumption of negligence is often raised by the circumstances of an accident, and it may be a legitimate presumption that an appliance which gives out while it is being used for its proper purpose in a careful manner is defective or unfit. How far that presumption may go, in an action by an employé against an employer, to shift the burden of proof from the former to the latter, must depend upon the circumstances of the particular case. The mere fact that the appliance is shown to have been defective is not enough to do so. It must appear that the defect was an obvious one, or such as to be discoverable by the exercise of reasonable care."

This language is pertinent to the present controversy. See, also, The Dago (C. C.) 31 Fed. 574, and Westinghouse Elec. Co. v. Heimlich (C. C. A.) 127 Fed. 93—a very recent decision of the Court of Appeals for the Sixth Circuit.

A decree may be entered dismissing the libel.