## THE KING GRUFFYDD.

(Circuit Court of Appeals, Second Circuit. April 6, 1904.)

### No. 160.

1. SHIPPING — INJURIES TO STEVEDORE — APPLIANCES — SELECTION — FELLOW SERVANTS.

Where a stevedore was injured during the raising of a skid weighing something more than a ton from a lighter, by the breaking of a wire cable known as a "topping lift," and it appeared that such lifts, when in apparent good condition, as was the one in question when selected, were capable of lifting 20 tons, the servant who selected such lift was not guilty of negligence in selecting it, instead of selecting a chain span, which was used for heavier loads.

2. SAME—APPLIANCES—INSPECTION.

A stevedore was injured by the breaking of a topping lift furnished by the vessel for use in raising a skid from a lighter. Such appliance consisted of a wire cable bent round a concave ring and spliced; the splicing being served with spun yarn, wrapped with bagging and saturated with oil. The appliance in question, instead of being carefully stowed between voyages, had been permitted to remain on deck, exposed to the weather, during several voyages to West India ports, which tended greatly to shorten the period within which it could be safely used. Held, that the master of the ship was guilty of negligence in permitting such lift to be used after a mere external inspection, without a periodic examination of the splice, and a renewal of the oiled service intended to protect it.

Appeal from the District Court of the United States for the Eastern District of New York.

This cause comes here upon appeal from a decree of the District Court, Eastern District of New York, in favor of libelant, for personal injuries sustained by him in an accident on the steamship King Gruffydd, on which he was working as a stevedore.

J. Parker Kirlin, for appellant.
Alfred C. Cowan, for appellee.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. At the time of the accident the port boom at No. 1 hatch had been rigged, and the stevedore's men were about to raise a heavy skid from a lighter, so as to bring one end of it to the rail of the ship, to facilitate discharge of cargo into the lighter. The boom was held up by a wire cable known as a "topping lift," which extended from the end of the boom to a block on the mast, and thence to

the deck. The fall from the end of the boom was hooked into the skid, and while it was being hoisted by the winch the topping lift broke close to the eye, which was fastened to the boom, and the latter fell upon the plaintiff. There is much dispute in the evidence as to how far up the skid had been lifted, and whether it had been kept free of the vessel; but the District Judge, who heard and saw all the libelant's witnesses, and all but two of the claimant's, finds it was raised till it caught on the side of the vessel, and we see no reason to dissent therefrom. There is no other finding of fact in the opinion, which is only five lines in length, and does not indicate the theory upon which defendant was held liable. We have reached a like result upon independent conclusions as to the truth of the testimony, which is very conflicting. We are satisfied that the boom was rigged up for service by the stevedores, not by the ship; that an ample supply of gear and tackle for such rigging was furnished by the ship, but that its officers did not indicate which should be used, the selection being left to the stevedore's men. We are not satisfied that the libelant at any time before the accident called the attention of the mate or boatswain to the topping lift, saying "it was rusty and didn't look very strong." The libelant testified on direct, cross, and redirect without any suggestion of his having made any such complaint. Subsequently one of his fellow workmen testified that he heard him say so; volunteering the statement, which was not responsive to any question. Thereupon the libelant was recalled, and told the same story. The importance of such evidence must have been so obvious, even to an ignorant man, that it is difficult to understand how the case could have been prepared for trial without any suggestion of it being made to libelant's counsel. Apparently none such was made, since he made no effort to elicit it from the plaintiff. Moreover, the libelant and his witness both testify that the statement to the mate or boatswain was made before anything had been done by them in the way of rigging, and while the end of the boom was hoisted up—it came to within 10 or 15 feet of the mast—and that they were looking up at it. It must have been considerably more than 15 feet above their heads, and, since the wire cable was only about 1 inch in diameter, the statement that plaintiff at that time noticed rust spots on it, and signs of weakness in it, is so extremely improbable, that, in view of the positive denials by both mate and boatswain, we must discredit it.

The claimant contends that the negligence which caused the accident was that of libelant's fellow servant, to wit, the particular stevedore who made selection of a wire-cable topping lift to support the boom, instead of a chain (technically called a "chain span"), which was available, and equally at his service, and would undoubtedly have withstood all strains. Much evidence has been introduced showing that when the ship's crew were working the derricks, in foreign ports, they used wire topping lifts only for light loads, not over a ton in weight, and the chain spans for heavier ones. But the question is not what the ship's crew did, but what a reasonably prudent man would have done when making the selection. The stevedores were about to discharge pig lead, 100 pounds to the pig; 15 to 20 pigs to a sling or single load. The skid weighed somewhat more than a ton—possibly a ton and a half. It might be anticipated that the skid would catch on some projection.

Indeed, such a contingency was taken into consideration, for the stevedores had men hauling on the skid to prevent it from contacting with the ship's side. In the event of its catching on some projection, the load would be increased, possibly up to the limit of the lifting capacity of the winch. The captain testified that such capacity was 3 tons. We are satisfied that, except in the place where it broke, which had been "served," as will be hereafter explained, and was therefore covered from view, there was nothing about the topping lift to indicate that its tensile strength was not normal. The selection made by the stevedores, therefore, was between a chain and a wire rope, both apparently in good order; and the only question is, would a reasonably prudent man have rejected the wire when about to rig the boom for regular sling loads of 1 ton, with the possibility of exposure to strains up to 3 tons? The testimony introduced by libelant is to the effect that a normal wire cable of that size would have held more strain than the engine could have pulled on it, while a witness called by claimant testified that a cable of that size in good condition will lift easily 20 tons. In view of this evidence, it cannot be held that there was any negligence in the selection of the topping lift instead of the chain.

The claimant contends that the defect was latent, and that there was no negligence in examination, nor in failure to anticipate and provide for such defect. The topping lift is a section of wire cable, at each extremity of which an eye has been inserted by bending the cable around a metal ring concave on its outer periphery, and splicing the end into the cable just above the ring. This splice necessarily breaks up the structure of the cable, and leaves a place more exposed than the rest of it is to the entrance and retention of water, and to the corrosive action of rust. In order to guard against this, the splice is "served"; that is, bagging saturated with oil is wrapped around the splice, and then spun yard is put over that—"served" over with a mallet. The service covered the place where the break in this wire rope occurred, and the defect which caused the break apparently could not have been discovered without removing the service. The captain testified that gear of this kind ought to be examined every time they are taken down and put up, but, under the authorities there was no obligation to take the structure apart on each of these examinations. The Olympia, 61 Fed. 120, 9 C. C. A. 393; Killman v. Robert Palmer & Son Shipbuilding & Marine Ry. Co., 102 Fed. 224, 42 C. C. A. 281. In the absence of anything which challenged attention, and under normal conditions of use, the claimant was entitled to rely upon a certain period of life in the structures it used. The captain testified that the life of a wire topping lift "depends on the use it is put to—sometimes it will last 3 and 4 and 5 years"—and that this particular one had been in use not more than 18 months. If it had been used in the ordinary way, there would be much force in the contention that the testimony failed to show any negligence on the part of the ship or those in charge of her. Such topping lifts are commonly and ordinarily used when in port for loading and discharging cargo—not always in every port, because sometimes when heavier loads are being moved the chain spans are used. While they are thus in use in port they are exposed to the weather, but that time occupies a comparatively small part of the ship's period of activity.

When cargo handling is completed and a voyage begins, the topping lifts are taken down and stowed either in the forepeak or in the alleyway under cover in a place that is warm and dry, owing to its proximity to the boilers; and, of the "three years' life" of such a cable, by far the greater part is thus passed in a place where the effects of moisture are dissipated, or at least greatly retarded. But this particular topping lift had had a very different experience. The ship had made 14 round voyages under her last charter between New York, Philadelphia, Baltimore, and Norfolk and some 16 West India ports; the delivery and discharge of cargo being unusually frequent. The boatswain testified that on the last voyage up from Tampico the topping lift, instead of being stowed away, was hung in the rigging up against the mast; one end being shackled to the sheer pole in the rigging, and the other being shackled to the deck. This was done, as he said, in order that it might be available to lift out any cattle that might die on the voyage. The captain, moreover, testified that, during the short trips between the different West Indian ports, it was left thus on the mast— apparently to avoid the necessity of constantly putting it up and stowing it away—and that during such times it would get all the dampness that there was in the salt air and in any rain or storm that happened to be going on at the time. It is also apparent that hung in this way, with one end fast to the sheer pole far up the mast, and the other end shackled to the deck, the rain and moisture which might be deposited on its whole length would naturally trickle down, so that the lower end would be exposed to a more continued wetting than other parts of the cable. And the water thus coming from above would have a tendency to make its way under the service to the point of weakness where the splice had disintegrated the structure of the cable. The captain further admitted that this topping lift was thus left on the mast "perhaps 100 days in the year." This is a use very different from the ordinary, and those in charge of the ship were bound to know that they were exposing the topping lift to conditions which would in all probability greatly shorten its life. Reasonable prudence, under these circumstances, would seem to require, in addition to the external inspection whenever it was put up or taken down, some periodic examination of the splice, and renewal of the oiled service which was intended to protect it. In the absence of proof of any such examination, we concur in the conclusion of the District Judge that there was negligence on the part of the ship.

The decree is affirmed, with interest and costs.