THE TRESCO.

(Circuit Court of Appeals, Third Circuit. February 9, 1905.)

No. 42.

1. SHIPPING—DISCHARGE—INJURIES TO SERVANT—DEFECTIVE CABLE—NEGLIGENCE—INSPECTION.

Plaintiff, a stevedore, was injured by the pulling out of the splicing of a cable used in unloading buckets of ore weighing about 2,000 pounds. The cable, of foreign manufacture, had been received from a sister ship, and was capable of lifting about 10 tons. Before the unloading was begun, the day prior to the accident, only a visual inspection of the cable was made, and it appeared that, if the tarred twine serving covering the splice had been removed, the defectiveness of the splice would have been discovered. *Held*, that the ship was guilty of negligence in failing to properly inspect.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 349–351.]

2. SAME—CONTRIBUTORY NEGLIGENCE.

Evidence that the splice was not smooth, and that libelant noticed the ends of wires protruding some two or three hours before the accident,

and that he failed to report the same because he thought it was spliced so that it would not come apart, was insufficient to charge him with contributory negligence.

Dallas, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 128 Fed. 780.

J. H. Brinton, for appellant.

Henry R. Edmunds, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

ACHESON, Circuit Judge. This is an appeal from a decree of the District Court dismissing a libel in an action brought by Oscar Griffing against the steamship Tresco to recover damages for personal injuries suffered by the libelant on the evening of December 4, 1902, about 11 o'clock, while he was assisting as a stevedore in the hold of the vessel in discharging a cargo of iron ore from the steamship, then unloading in the port of Philadelphia. The libelant's duties required him to help in filling with ore large iron buckets as they were lowered into the hold by a steam windlass and wire cable, the cable being supplied by the vessel for the above-stated purpose. At the time in question the libelant had assisted in filling with ore one of the buckets, and during the process of hoisting the loaded bucket the splicing in the lower end of the cable pulled out, and the bucket fell. In its fall the bucket overturned, and part of its contents was thrown against the libelant, thus inflicting the injuries complained of. It was shown that the splice was covered with a serving of tarred twine, that the weight of a filled bucket was about 2,000 pounds, that the breaking strain of the cable was at least 10 tons, and that the discharging began 4 o'clock on the afternoon of the day before the libelant was injured.

The testimony, based upon examination of the cable since the splicing pulled out, establishes that the splice was not properly made. The expert witnesses agree that it was defectively made, and the court so found. The evidence satisfies us that the splice was grossly defective in its construction. The indications warrant the belief that the splice was not the work of an experienced mechanic. The master or owner of the Tresco had the means of showing the origin and history of the cable, but did not do so. Nothing was shown save that the cable, spliced and served with tarred twine as when it gave way, was brought to New York and delivered to the Tresco in August, 1902, by a sister ship belonging to the same owner. The Tresco's witnesses say the cable was then apparently new, and that it was used on the Tresco only once before the disaster in question. The extent or character of that use was not shown. The cable was not tested at the time it was brought on board the Tresco, nor afterwards. Neither was the splice ever uncovered for inspection. In regard to the inspection of the wire cable on the occasion when the splicing drew out, the learned District Judge says:

"Before the laborers began to take out the ore in Philadelphia, the first mate of the Tresco examined the rope carefully, and nothing was found to

indicate that it was unsafe. The serving covered the splice and was not removed, since there was no external sign to suggest that the rope might be unable to do its work. A wire rope of this size should lift at least 10 tons. Several times after the hoisting began the mate examined the rope, the last inspection being about 4 o'clock on the afternoon preceding the accident, and found nothing that should have put him on his guard."

It may be assumed, not uncharitably, that the testimony of the mate as to his inspection would be as favorable to the ship as was at all consistent with the truth. Now, his testimony was as follows:

In chief, for Tresco:

"Q. Did you inspect this fall which was used at No. 3 hatch before the discharge began at Philadelphia on that occasion? A. Yes, sir. Q. What sort of inspection did you make of it? A. As I generally do, in fact always do, when I am rigging the cargo gear. I inspect the ropes; I take them up in my hand, and examine them to see if they are fit for work. Q. Did you examine the splice of this rope at No. 3? A. Yes, sir. Q. When did you do that? A. I examined it particularly, before we started to work, while rigging the gear. Q. How long before the accident? A. That would be on the 3d. Q. What time of day? A. Between 3 and 4 o'clock. Q. What time did you begin discharging? A. 4 o'clock. Q. On the 3d day of December? A. Yes, sir. Q. What was the condition of the splice then? A. Good. Q. Describe how that splice was fixed. Was there serving around where the wire was spliced? A. The rope was served around where the thimble was and the splice; it was served over. Q. Was the splice all covered up with the serving? A. All covered up with the service. Q. Did it all look in good order? A. All in good order. Q. Was this service tarred? A. Yes, sir; tarred spun yarn. Q. Did you look at this fall again during the discharge? A. Yes, sir. I periodically go around on purpose. I hardly ever pass a gangway without I look at the gear. Q. What was the last time before the accident happened when you examined this splice to see whether it was all right? A. Between 4 and 5 o'clock, before dark. Q. Did you examine all the other splices, too? A. Yes, sir. On this occasion I did not take it in my hand. Q. On this last examination? A. No. Q. How near were you to it when you examined it? A. Within a foot or two. Q. You were looking at it then to see whether it was in good order? A. Yes, sir. Q. Did it show any signs of giving away? A. No signs of ever giving away."

On cross-examination by libelant's counsel:

"Q. Were you present when this rigging was put up? A. Yes, sir. Q. Did you help do it? A. No; I directed how it should be done. Q. You brought it out of the forecastle; then what did you do with it? A. Rove it in its place, and sent it up on a derrick. Q. Then what? A. Then they went to work. Q. That was all that was done? A. Yes, sir; of course it was examined. I examined it before it was rove. Q. While it was coiled? A. No; after it was turned out of the coil and rove into its place I examined it, or while it was getting rove. Q. Describe what 'reeving' is. A. Putting it in its place. Q. Give us a little description. A. It is rove through the blocks—through the pulleys. Q. By steam power? A. No, by hand. You simply pick up the end and put it through. Q. You run it through your blocks and fall? A. Yes, sir. Q. While these men were reeving it, you cast your eye over the cable as it was pulled out and put in position? A. Yes, sir. Q. That was the character of examination you made at that time? A. Yes, sir. I took it and pulled it through my hand. Before I started to discharge the ship I picked it up and examined it to see if there were any bad places in it—if there was a flaw in it of any kind. Q. That is, after the fall has been put in position? A. While it is being put in position. Q. Do you mean to say that while these men are putting this cable in position you pass every foot of it through your hand? A. No, not exactly that, because with the experience I have had I do not want even to do that. I can tell a piece of rope when I see it. I picked the rope up to make sure. I do not exactly pull the rope altogether through my hand. Q. But you cast your eye over it generally and note any defects? A. Yes, sir."

Giving the fullest weight to the testimony of the mate, his so-called "inspection" of the wire cable seems to us to have been little more, if any more, than a mere visual inspection. But at the best it was very superficial. In view of the circumstances, we think it was altogether inadequate. The workmen were about to engage in a service involving hazard, in the hold of the ship, under ore-loaded buckets which were lowered and hoisted by means of the cable operated by the steam windlass. So far as the evidence shows, the cable had not before been subjected to such a strain. It had not been tested while aboard the Tresco. Whether or not it had ever been tested was not known to the ship's master. He did not know where or by whom the cable was manufactured, or where or by whom the splice was made. The covering had not been removed from the splice for the inspection of the latter since the cable was delivered to the Tresco. Before the cable was put to use on the occasion in question, reasonable prudence required the removal of the tarred service and an examination of the splice. This could have been done readily and in a very short time. We cannot accept the suggestion that, if the serving had been taken off, the defect in the splicing might not have been discovered. We think the defect would have been disclosed and the disaster prevented. In the circumstances, we think that the owner and master of the Tresco failed in their duty to the libelant, in that the cable was neither tested nor properly inspected before he was put to work in discharging the cargo of iron ore.

The Tresco, it will be perceived, is in no position to invoke the established principle that, if one "purchases from a manufacturer of recognized standing, he is justified in assuming that in the manufacture proper care was taken, and that proper tests were made of the different parts of the machinery, and that as delivered to him, it is in a fair and reasonable condition for use." Richmond, etc., R. R. Co. v. Elliott, 149 U. S. 266, 272, 13 Sup. Ct. 837, 37 L. Ed. 728; Westinghouse Elec. & Mfg. Co. v. Heimlich, 127 Fed. 92, 62 C. C. A. 92. For, although the evidence must be within the reach of the owner and master of the Tresco, it has not been shown who the manufacturer of the cable was, or (what is more important) by whom the cable was spliced.

The views we have expressed above, and our conclusion that negligence in this matter is justly chargeable to the Tresco, find support in decisions of the courts. The Rheola (C. C.) 19 Fed. 926, 928; The William Branfoot, 52 Fed. 390, 3 C. C. A. 155; The King Gruffydd (C. C. A.) 131 Fed. 189.

There was, we think, no evidence upon which a charge of contributory negligence on the part of the libelant could be sustained. The evidence in support of the charge was simply this: Two of the libelant's fellow workmen testified that the splice was not smooth, and that they saw ends of wire protruding from it. The libelant testified that two or three hours before the accident he noticed the ends of the wire. When asked if he reported it, he answered, "No, I did not, because I thought it was spliced in a decent way and tucked in so that it would not part." We do not see why the roughness or protruding ends of wire should have alarmed the libelant. They did

not indicate to him any weakness, and he had a right to rely upon the care and vigilance of his employer.

The decree of the District Court is reversed, with costs, and the cause is remanded to that court with directions to proceed to the assessment of libelant's damages and enter a decree in his favor in accordance with the views expressed in this opinion.

DALLAS, Circuit Judge (dissenting). The casualty in question resulted from the imperfect splicing of the cable employed in doing the work in which the plaintiff was engaged. The cable in all other respects was fit for the work to which it was put, and it matters not what the general character of the inspection given it may have been, for nothing short of the removal of the "tarred service" in which the splicing was enveloped would have disclosed its defectiveness, or have availed to avert the accident. This, in the opinion of the majority of the court, "reasonable prudence" required to be done, but I am unable to concur in that opinion. The legal obligation of a master to be regardful of the safety of his servant is not founded upon any doctrine which is peculiar to the contract for personal service, but upon the general rule that every one is bound, in his acts and conduct, to be duly careful to avoid doing hurt to others. Wherever one man is, as a matter of business, supplied by another with any article which is liable to inflict injury when being used, he, though not a servant, is entitled, precisely as if he were, to assume that ordinary care has been taken to see that the article is a reasonably safe one. Dixon v. Bell, 5 Maule & S. 198; Thomas v. Winchester, 6 N. Y. 397, 57 Am. Dec. 455; Smith v. R. R. Co., 19 N. Y. 127, 75 Am. Dec. 305; Caswell v. Worth, 5 El. & Bl. 849; Blakemore v. Railroad Co., 8 El. & Bl. 1035; MacCarthy v. Young, 6 Hurl. & N. 329; Copeland v. Draper, 157 Mass. 558, 32 N. E. 944, 19 L. R. A. 283, 34 Am. St. Rep. 314; Story, Bailm. §§ 275, 390, 391a; Redf. Carr. § 513, note. The duty of the officers of this vessel, with respect to the cause of the plaintiff's injury, was completely discharged if they omitted no precaution concerning it which an ordinarily prudent person would have taken, and I do not believe that any man, except an uncommonly distrustful ·one, would have thought it necessary to take the cover from this splicing. Reilly v. Campbell, 20 U. S. App. 334, 59 Fed. 990, 8 C. C. A. 438; Baulec v. Railroad Co., 59 N. Y. 359, 17 Am. Rep. 325; Hough v. Railway Co., 100 U. S. 213, 25 L. Ed. 612; Railway Co. v. McDaniels, 107 U. S. 454, 2 Sup. Ct. 932, 27 L. Ed. 605; Tuttle v. Railroad Co., 122 U. S. 189, 7 Sup. Ct. 1166, 30 L. Ed. 1114. The cable itself was amply strong, and there was nothing to excite suspicion that it had been so improperly spliced as not to be of substantially uniform strength throughout. The badly made connection was a snare for which ordinary caution would not be on the watch, and the defect was a latent one which ordinary vigilance would not detect.

I do not think that the judicial decisions referred to in the opinion of the majority support the views which are there expressed. In The Rheola (C. C.) 19 Fed. 928, "the chain was defective. * * * It was rusted, and considerably worn in appearance. The breaking of the other chain was a circumstance to direct attention, and put the

master of the steamer on inquiry." In the present case there was nothing in the appearance of the splicing to indicate its weakness, or to put any officer of the vessel on inquiry respecting it. In The William Branfoot, 52 Fed. 392, 3 C. C. A. 155, it was said:

"It is true that the floor of the ship covered the flanges of the stanchion and the bolts fastening them to the tank, but the tests of an inspection are not merely those of eyesight, and, although the absence of rivets at the bottom of the stanchion might have been concealed, it must be assumed that whether the stanchion was secure or insecure could have been discovered without involving tearing up the deck to ascertain, in the first instance, the exact defects which existed."

In the case before us, without taking off the service, the defect in the splicing could not have been perceived. In The King Gruffydd (C. C. A.) 131 Fed. 191, the charge of negligence was, upon the special facts of that case, sustained; but although the captain had testified that gear of the kind there in question "ought to be examined every time they are taken down and put up," yet the court said that, "under the authorities, there was no obligation to take the structure apart on each of these examinations," and in support of this statement cited The Olympia, 61 Fed. 120, 9 C. C. A. 393, and Killman v. Robert Palmer & Son Co., 102 Fed. 224, 42 C. C. A. 281. The opinion of the court in each of these cases may be profitably read in connection with this one, but I content myself with briefly stating that in the first it was held that an accident which resulted from the breaking of a rope in which there were no patent defects was one which, for that and other reasons, "could not have been prevented by that degree of foresight, care, and caution required by law"; and in the second that, in the absence of anything to put him upon inquiry, the defendant, the employer of the plaintiff, was not negligent in failing to remove an eyebolt, which had been in use for about a year or a year and a half, for the purpose of searching for latent defects in it.

In my opinion, the decree of the court below (128 Fed. 780) was right, and therefore I dissent from this judgment of reversal.