SIERACKI v. SEAS SHIPPING CO., Inc.
(BETHLEHEM STEEL CO. et al., Third-Party Defendants).

No. 3119.

District Court, E. D. Pennsylvania.

July 13, 1944.

against the Seas Shipping Co., Inc., owner of the Robin Sherwood, to recover damages for injuries received while engaged in loading that vessel. The Seas Shipping Co., impleaded the two Bethlehem Companies and the plaintiff then amended his complaint to include a cause of action against each of the two third-party defendants. The trial was to the court with a jury, but before the testimony was completed it was stipulated that the plaintiff's damages were $9,500 and that the court should determine liability as though a jury trial had been waived at the outset.

The plaintiff, in his brief, has correctly stated the basic facts as follows:

The defendant, Bethlehem Steel Company, was awarded a contract by the United States Maritime Commission to build the steamship Robin Sherwood. That company subsequently sublet a portion of the job to the defendant, Bethlehem Sparrow's Point Shipyard, Inc. The latter undertook to assemble and install on the vessel, among other things, certain cargo gear and particularly, the ten-ton boom and tackle at number 5 hatch.

Upon completion of the vessel in June of 1941, the ten-ton boom was tested by lifting a dead weight of twelve and a half tons, and the vessel was then turned over to the defendant, the Seas Shipping Co., Inc., which had purchased it from the Maritime Commission.

The vessel was in service approximately eighteen months when it called at the port of Philadelphia on December 23, 1942, to load parts of freight cars for shipment abroad. The plaintiff was one of a number of longshoremen who were engaged to load the cargo into the vessel. After rigging the gear on the ten-ton boom, which had never been used up to this time, the longshoremen lowered one piece of freight into the hold of the ship and were engaged in stowing away the second part of the freight car, the weight of which was not in excess of 8.2 tons, when the shackle which supported the ten-ton boom broke, causing the boom and tackle to come down and injure the plaintiff.

I. The Plaintiff's Case against Seas Shipping Co., Inc.

The plaintiff must show negligence according to the rules of the principles of the maritime law, and the decisions of the federal courts, not those of Pennsylvania, are controlling.

Freedman & Goldstein, by Abraham E. Freedman and Henry P. Carr, all of Philadelphia, Pa., for plaintiff.

Krusen, Evans & Shaw, Rowland C. Evans, Jr., and T. E. Byrne, Jr., all of Philadelphia, Pa., for Seas Shipping Co., Inc.

Evans, Bayard & Frick, by Philip H. Strubing, all of Philadelphia, Pa., for Bethlehem Sparrow's Point Shipyard, Inc.

KIRKPATRICK, District Judge.

This is a civil action, on the law side, brought by a longshoreman, originally

Concededly the Jones Act, 46 U.S.C.A. § 688, does not apply, the plaintiff's suit not being against his employer. The New Brooklyn, D.C., 37 F.Supp. 955; Kwasizur et al. v. Dawnic S. S. Co., et al., D.C., 25 F.Supp. 327. The plaintiff was injured on a ship lying in navigable waters and while he was engaged in the performance of a maritime service and the wrong which is the subject of the suit is a maritime tort. Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 61, 34 S.Ct. 733, 58 L.Ed. 1208, 51 L.R.A.,N.S., 1157. The court has jurisdiction either in admiralty or on the law side, Murray v. Pacific Coast S. S. Co., D.C., 207 F. 688.

The plaintiff asks the court to find that the accident occurred by reason of unseaworthiness of the vessel and I make that finding, but his contention that this fact alone entitles him to recover against the owner cannot be sustained. If he were a seaman in the employ of a vessel he would, of course, be entitled to a verdict on that showing alone. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed 760. But he is not a seaman, nor a member of the crew of the vessel. What was decided in International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed 157, and Uravic v. Jarka Co., 282 U.S. 234, 51 S.Ct. 111, 113, 75 L.Ed. 312, was that in the Jones Act the word "seaman" was intended by Congress to include a longshoreman. It has never been decided that longshoremen are seamen generally and, in fact, the Court in the Haverty case pointed out "that for most purposes, as the word is commonly used, stevedores are not 'seamen.'"

This leaves the plaintiff standing upon the general maritime law of tort. "This means, as we indicated, by the law of the United States, with the provisions of section 33 [46 U.S.C.A. § 688] left out." Uravic v. Jarka, supra. The maritime law makes shipowners liable to third persons properly on board as invitees, including stevedores, if they are injured through the fault or negligence of the shipowner, but not otherwise. The Howell, 2 Cir., 273 F. 513; Jeffries v. DeHart, 3 Cir., 102 F. 765.*

The measure of the shipowner's duty is reasonable care. In the present case the particular duty of care involved is the duty to inspect the ship's equipment, and liability depends upon whether the shipowner exercised the degree of care in this respect which the maritime law imposes upon him.

At this point further detailed fact findings are necessary and I make them as follows:

The shackle was a forged U-shaped bar of mild steel about one and three-quarter inches in diameter, pierced at the two ends to take a cross-bar. The defect which caused it to break was a cavity known as a pipe, located in the center of the bar just at the bend of the U extending longitudinally a distance of possibly three-quarters of an inch. From this pipe a crack or seam, also longitudinal, extended to the outer surface of the U at the crown or bend. The separation or parting line at the surface of the shackle was "a couple of thousandths of an inch wide"—an estimate which I accept in default of accurate instrumental measurements. The defect occurred in the course of forging the shackle. After forging, as part of the process of manufacture, the entire shackle was galvanized. Before it came into the hands of any of the defendants, it was painted. It is unlikely that the crack was visible to the naked eye, even without galvanizing or painting, but certainly when the shipowner got the shackle as part of the ship's equipment it had been effectively concealed and was entirely invisible. I find further, not only from the testimony but from my own examination of the shackle, that its surface was not perfectly smooth anywhere and that there was no exceptionally large raised area at the line of the fracture which would

* In Jeffries v. DeHart, supra, the court said, "the same principles apply as would have been applicable if it had happened upon the land and recovery had been sought in a common-law action." That statement, however, was made before the Supreme Court decided the Uravic case, supra, in which it held that the cause of action was a maritime tort. It was also made before the Supreme Court of Pennsylvania decided the case of Ebbert v. Philadelphia Electric Co., 330 Pa. 257, 198 A. 323, in which that court made a marked departure from the generally accepted rule as to vendors' duty of inspection on sales of chattels. See Vendors' Tort Liability, 89 U. of Pa. Law Review 306. I do not think that the court meant by its statement that the law of Pennsylvania governed, but merely that at the time the statement was made there was no difference between it and the general law of maritime tort.

call attention to it or which is noticeably different from other unevennesses on its surface. The crack was not welded after forging nor "doctored" in any way and there was nothing on its surface to suggest that it had been. To sum up, when the ship was turned over to the Seas Shipping Co., no visual inspection of the shackle, however close, would have disclosed anything to indicate that it was defective.

When the Seas Shipping Co. received the ship it was furnished with certificates from the United States Maritime Commission and the shipbuilder which certified that the gear, including the shackle here involved, had been tested with a load 25 percent in excess of its rated capacity of ten long tons and had been carefully examined after the test and before delivery of the vessel on July 16, 1941. In addition, Captain Bonn of the Robin Sherwood had been present and saw a test (probably the one referred to in the certificates) of the ten-ton boom at which it raised twelve and one-half tons. After the gear was disassembled for examination, it was reassembled on the ship and it had not been tested between that time and the day of the accident. From the certificate and specifications the master knew that the shackle was a product of a reputable manufacturer and had been installed by a responsible and competent shipbuilder.

During the 18 months prior to the accident, the shackle, as well as other parts of the equipment, was properly cared for and was not allowed to rust or deteriorate. It was also inspected visually, the last time being two to four weeks before the accident. While this inspection was not close, the fact is that the most meticulous visual inspection would not have disclosed any defect.

The pipe would undoubtedly have shown up under an X-ray examination, though there is no evidence that the crack would. The crack could have been discovered if its location could have been divined and the bar at that point had had the paint removed by a solvent, given an acid bath and etched by a process which constitutes a metallurgic test, known as deep-etch or macro-etch. This process was actually applied to the shackle during the trial, and after all the steps had been taken, the crack was barely visible.

The plaintiff does not seriously argue that the law required the shipowner to apply either of these tests to the shackle and similar equipment. He does, however, contend that the shackle should have been suspended by a wire, struck with another piece of metal, and the sound given out observed, and that failure to do this constituted negligence. There was evidence that a test of this kind is customary in shops where articles of this character are manufactured. There is no testimony to the effect that it is ever used anywhere else, or that shipowners in practice ever disassemble ship's gear and equipment and apply it. As described by the plaintiff's witness it involves hanging up a number of pieces of the same size and contour and striking them, in which case if any one of them gives out a different note, it is cause for suspicion. I do not think that the law requires a shipowner to provide himself with several pieces of equipment duplicating each part of his ship's gear, in order to apply this test.

The plaintiff's expert testified that, even without other pieces to use as a standard, tapping a piece such as the one in question will produce a dull sound which will reveal that it is defective, "if the fracture is bad and if it is transverse" and he further said that, in his opinion, this particular shackle would have given a dull sound. Of course, it may be accepted that if a crack is very large it will cause the bar to give a dull instead of a ringing sound. Parenthetically, the crack in this shackle was longitudinal, not transverse and, of course, any fracture in a shackle is bad in one sense. I do not, however, accept the testimony of the plaintiff's expert that this particular shackle with a hair line crack of two one-thousandths of an inch would have given out a tone so noticeably dull as to indicate any thing to the listener. He was shown to be so completely wrong in his very definitely expressed opinion that the crack had been doctored and a layer of metal added and the whole welded with an acetylene torch, that I am unwilling to accept his guess at the kind of sound which this particular shackle, before it was broken apart, would have given out. Rejecting his opinion, I find that there is no evidence to the effect that, striking this shackle, by itself and without others like it for comparison, with a piece of metal would have disclosed anything wrong with it.

Nor do I accept the plaintiff's expert's testimony to the effect that the load test of twelve and one-half tons given to the boom and tackle was inadequate. The fact is that it was conducted under the supervision and in the presence of representatives of the

United States Maritime Commission and in accordance with the usual and customary method of testing booms and lifting-gear followed by reputable shipyards throughout the United States. Even had it been tested at seventeen and one-half tons as the expert thought it should have been, it would be a pure guess to say that it would have failed in any way. It was designed to lift ten tons, with a breaking point at forty tons and a yielding or distortion point of twenty tons.

But apart from the fact question and assuming that the shackle, if suspended and tapped, would have given out a suspicious sound, I am of the opinion that under the circumstances of this case the shipowner was not required by law to make such a test or to do more than he actually did. The question involves the extent to which a shipowner, who is not the builder of the ship nor the manufacturer of its gear, is under an affirmative duty to discover unknown and invisible defects in a ship's equipment.

No doubt a high degree of diligence is prescribed, and rightly so, but it all comes down to what is reasonable under the circumstances. The law cannot require a man to take more care than is reasonable to prevent risks inherent in his conduct, without making him an insurer. There is no intermediate measure of duty, and it is well-settled that the responsibility of a shipowner to invitees is not that of an insurer. Without attempting to lay down a general rule, I think that a shipowner is not negligent in permitting the use of the ship's equipment by stevedores in a case in which the particular portion which failed was known to the shipowner to have come from an established and reliable dealer in maritime supplies and where, in the presence of the master of the vessel as well as representatives of the Maritime Commission, the equipment was subjected to a standard test prescribed by the Commission and demonstrated to be capable of safely performing under a load 25 per cent greater than that for which it was designed and 50 per cent greater than that under which it finally failed, in which the equipment was adequately cared for at all times and visually inspected a few weeks before its failure—all this, it being understood, being in the case of an internal defect in a bar of steel which was invisible on the surface.

The case of The Tresco, 3 Cir., 134 F. 819, decided by a divided court, strongly relied on by the plaintiff, goes to the extreme limit and puts a heavier duty on the shipowner than does any case of which I know, but I would have to go much further than it goes to declare this defendant liable. In The Tresco case, supra, it was held that a shipowner was bound to remove the tarred twine covering from a spliced cable to see that the splicing was properly done. Perhaps under the circumstances of that case that was not requiring as much as the bald statement would indicate. So far as the record showed no one knew who manufactured the cable or who had spliced it or from whom it was purchased. There was no evidence that it had ever been tested or that it had ever been subjected to any strain such as that under which it broke. Under such circumstances one might well hesitate to say that it was unreasonable to hold that a "very superficial" visible inspection of the cable was a sufficient performance of the duty of care.

## II. The Plaintiff's Case against the Bethlehem Companies, the Third-Party Defendants.

The case against the Bethlehem Companies stands on a very different footing from that against the shipowner although the measure of their duty and responsibility to the plaintiff, namely, reasonable care, is the same. Bethlehem Sparrow's Point was a subcontractor which installed the defective equipment and was in substantially the same position as the manufacturer. Reasonable care on the part of one who manufactures a thing which, if defective is capable of causing extensive damage and great injury, is a far more exacting duty than that of one who, having bought it, permits others to use it.

There is no question that, in this case, the shackle was defective when it came into the hands of Bethlehem Sparrow's Point and when it was installed as part of the cargo gear of the vessel. Sierocinski v. Du Pont Co., 3 Cir., 118 F.2d 531, cited by the defendants, is not in point. In that case the whole question was whether the circumstances of the accident, taken in connection with the character of the instrumentality (a dynamite cap) which caused the injury, afforded any evidence that the defect must have occurred in the course of manufacture. This Court thought that the evidence excluded the possibility of its having occurred anywhere else. The Circuit Court of Appeals held that it did not and that, therefore, the manufacturer could not be held responsible.

The case against the Bethlehem Companies is still one of maritime tort. In Atlantic Transport Co. v. Imbrovek, supra, the court said [234 U.S. 52, 34 S.Ct. 735, 58 L.Ed. 1208, 51 L.R.A.,N.S., 1157]: "If more is required than the locality of the wrong in order to give the court jurisdiction, the relation of the wrong to maritime service, to navigation, and to commerce on navigable waters, was quite sufficient." Nevertheless the principles of McPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas.1916C, 440, are broadly applicable. The law of that case has become so widely accepted as to be a part of the general law of torts, maritime as well as common law.

The only question as to these defendants is whether the plaintiff has met the burden of proof of showing negligence. Concededly there is no direct testimony of the effect that these defendants did not make tests other than the lifting test at the weight of twelve and one-half tons, which was made when the ship was delivered to the purchaser.

These defendants are shipbuilders on a large scale and it is to be assumed that they have adequate and complete plant and equipment, including forge and metal shops, as well as experts familiar with metals and all the practices of forge shops and are expert in the examination and testing of metals. A measure of diligence in searching for and discovering defects which would be entirely unreasonable in case of a shipowner, might quite properly be exacted from the builder. It is undisputed that the X-ray test would have disclosed this defect. Perhaps that is more than should be required, but this particular shackle was a key piece in the largest boom tackle on the ship and a link, the breaking of which might cause as much or more damage as that of any other piece of steel on the ship. However that may be, I am satisfied and so find, that the test, by tapping or striking with a piece of metal, if performed as the plaintiff's expert said it should be—that is, by suspending a number of pieces of the same size and contour and striking one after the other and comparing the tone given out—would have disclosed, to the ear of an expert, something which would have put him on notice.

■ On the basis of this fact finding, the plaintiff has met his burden. If the test would have disclosed the defect, then either it was not made, or if made, was negligently conducted or else the shackle was installed with knowledge of its weakness.

■ The Bethlehem Companies are not protected by the name and reputation of the concerns by which the equipment was manufactured and sold. No builder of structures, vehicles or mechanisms which may cause injury by failure of parts is— that is the whole point of McPherson v. Buick, supra—unless, perchance, there is no conceivable test or inspection within the bounds of reason which could disclose a defect. The Bethlehem Companies' argument on this point, reduced to its simplest terms, is in reality a denial of the doctrine of McPherson v. Buick.

Counsel for the Bethlehem Companies argues that the plaintiff has failed to show that the shackle which broke at the time of the accident was the same shackle installed on the vessel before its delivery to the Seas Shipping Co.

It was stipulated that on June 2, 1941, Bethlehem Steel Company purchased a block including a galvanized shackle, and that the block including shackle was painted and installed by Bethlehem Sparrow's Point, Inc., at the boom end of the ten-ton boom at the main mast of Hull 4350 (The Robin Sherwood).

Captain Bonn, who joined the vessel sometime before her delivery to the owners and remained with her continuously to the date of the accident, testified that the ten-ton boom was never used for any lifts from the time of the test (prior to the turning over of the ship to the Seas Shipping Co., on or about July 15, 1941) to the date of the accident, on December 23, 1942. On being shown the broken shackle, which had been produced in court, he testified that it was the same one which was on the boom at the time of the accident. His testimony then proceeded: "Q. Now, on the occasion that *this* tackle was used prior to this accident, who rigged the tackle? A. The riggers from the Bethlehem Shipbuilding Company.

"Q. I mean just prior to the accident? A. Oh, prior to the accident, the longshoremen.

"Q. This is on December 23, 1942? A. Oh, the longshoremen rigged the gear."

This taken in connection with his testimony as to the position in which the boom was carried and that of Acker, the mate, as

to routine inspections and lubrication, neither of whom referred to any replacement of equipment, is sufficient to warrant a finding that the shackle installed by the Bethlehem Sparrow's Point Co., Inc., was the same shackle which caused the accident.

Even without this testimony, however, if the Bethlehem Companies wanted to avail themselves of the defense that the shackle might have been changed, the burden was upon them to show it. This is a type of equipment that is quite permanent in nature. It appears that, after the first test with the weights, the boom was put in a vertical position and remained in that position until the day of the accident. With the exception of routine visual inspections there is no evidence that this particular boom received any attention. After the test it was not used at all until the date of the accident. Under these circumstances, unless evidence to the contrary is introduced, the court may and will conclude that the shackle installed by the Bethlehem Sparrow's Point Co., Inc., was the same one which parted on December 23, 1942 and caused the injuries complained of.

It is a general rule that a prior existence or condition is evidential of a later one unless the contrary is shown. See 22 C.J. 86, 31 C.J.S., Evidence, § 124. Considering the circumstances here, the lapse of time does not destroy the probative force of the inference (sometimes called "presumption") of continuance. See Liverpool & London & Globe Ins. Co. of Liverpool, England, v. Nebraska Storage Warehouses, 8 Cir., 96 F.2d 30, 36; Berwind White Coal Mining Co. v. City of New York, 2 Cir., 48 F.2d 105, 106; Wigmore, On Evidence, Sec. 437.

The close relationship of these two companies makes it unnecessary to determine or apportion the liability as between them. I hold that they are both liable and judgment may be entered accordingly.

### Answers to Requests

The statements of fact contained in the foregoing opinion may be taken as special findings and the statements of law as conclusions of law. In accordance with the rule I also state the following conclusions of law separately:

*Plaintiff's requests for findings of fact.*

I affirm requests Nos. 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, (modified to the extent that the galvanizing and painting entirely concealed any surface indication of the crack), 13, 15, 19 and 21.

I deny requests Nos. 16, 22, 23 and 24.

Requests Nos. 6, 14, 17 and 18 are answered by the general finding that the Bethlehem Companies failed to meet the duty of care required of them as manufacturers of the vessel and that the Seas Shipping Co. did meet the duty of care which the law imposes upon it.

As to request No. 20, I find that there is no evidence that tapping the shackle by itself would have disclosed the defect. There is evidence which I accept that, had the shackle been hung with others of the same size and shape and tested in that manner by an expert the defect could have been noticed.

*Plaintiff's requests for Conclusions of Law.*

I affirm requests Nos. 1, 2 (with the qualification that the company should have used the utmost precaution reasonable under the circumstances).

Request No. 3 is answered by the general fact finding that the Bethlehem Companies were negligent.

Request No. 4 is affirmed.

Requests Nos. 5 and 6 are correct statements of the general law as applied to seamen but do not apply to this plaintiff.

Request No. 7 is denied.

Request No. 8 is affirmed and No. 9 is affirmed so far as it relates to the duty to make reasonably proper examinations.

Request No. 10 is denied.

Request No. 11 is affirmed as regards to the Bethlehem Company but is denied as in respect of the two shipping companies.

*Original defendant's requests.*
*Findings of Fact.*

I affirm requests Nos. 1, 2, 3, 4, 5, 6, 7 (with the qualification that it might have been discovered by the striking test, if conducted by an expert in conjunction with other shackles.)

I affirm requests Nos. 8, 9, 10, 11, 12, 13 and 14.

*Requests for Conclusions of Law.*

I affirm requests Nos. 1, 2, 3 and 4.

The remaining requests need not be answered in view of the holding that the Seas Shipping Co. is not liable.

Requests of Third-Party Defendants for Findings of Fact.

I affirm requests Nos. 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, (as modified by the statements of fact in the opinion).

I deny requests Nos. 5 and 17.

Requests Nos. 19 to 27 inclusive need not be answered in view of the holding with the Seas Shipping Co. as not liable.

*Requests for Conclusions of Law.*

I affirm request No. 1.

I deny requests Nos. 2, 3, and 4.

Requests Nos. 5 to 8 need not be answered.

Judgment may be entered in favor of the plaintiff against Bethlehem Steel Company and Bethlehem Sparrow's Point Shipyard, Inc., in the amount of $9,500 with interest.