LORETTA R. SINATRA AND SAMUEL SINATRA, PLAIN-
TIFFS-APPELLANTS, v. NATIONAL X-RAY PRODUCTS
CORP., DEFENDANT-RESPONDENT, AND NORTH AMER-
ICAN PHILIP'S COMPANY, INC., THIRD-PARTY DE-
FENDANT-RESPONDENT.

Argued March 3 and 4, 1958—Decided April 28, 1958.

*Mr. James A. Major* argued the cause for the appellants (*Messrs. Breslin & Breslin,* attorneys).

*Mr. Milton T. Lasher* argued the cause for the defendant-respondent.

*Mr. James J. Langan* argued the cause for the third-party defendant-respondent (*Messrs. Emory, Langan, Lamb & Blake,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The Appellate Division, on an appeal taken by National X-Ray Products Corp., reversed the judgment against it, and granted leave to North American Philip's Company, Inc. to move in the trial court for vacation of the judgment against it from which it had not taken any appeal. We certified under *R. R.* 1:10–2.

National, a New York corporation authorized to do business in New Jersey, was engaged in the sale of X-ray equipment and supplies and was the distributor for North American, a Delaware corporation engaged in the manufacture of X-ray equipment and supplies. Under date of June 8, 1954 North American, on behalf of its dealer National, submitted estimates to the Hackensack Hospital covering its X-ray requirements. It assured the hospital of North American's full cooperation with National, and "guaranteed" the X-ray equipment and the "Philip's shock-

proof cables" for one year and that National "shall give unconditional service and maintenance performances at no charge to run concurrently with the guarantee for one year." Thereafter the hospital purchased a diagnostic X-ray unit which was installed in the fall of 1954. Mr. Ulan, the administrator of the hospital, testified that the purchase order was given to National, which installed the equipment under the supervision of a technician from North American, and that after the installation the equipment was serviced by National on specific order and requisition by the hospital. Mr. Kohlhof, chief technician of the hospital, testified that he was in sole charge of the X-ray unit, that whenever repair service was necessary he called National which responded immediately, and that no one else ever serviced the equipment.

On March 2, 1955 the plaintiff Loretta R. Sinatra was a patient at the hospital and was taken to the X-ray room for fluoroscopy and X-ray. While she was on the X-ray table an overhead electrical cable of the X-ray unit sparked and emitted "billows of black smoke." She testified that she felt her arm burn, jumped off the table, and in doing so injured herself. The high voltage cable which occasioned the accident extended about six feet above the floor from a transfer to the X-ray tube and operated at an electric potential between 20,000 and 125,000 volts. On May 10, 1955 the plaintiff Loretta R. Sinatra, and her husband Samuel Sinatra who sued *per quod,* filed a complaint against National charging that Mrs. Sinatra's injuries resulted from National's negligence and seeking damages. The complaint did not join North American as a party defendant nor did it assert any warranty to the plaintiffs from either National or North American. See *Cornelius v. B. Filippone & Co., Inc.,* 119 *N. J. L.* 540, 541 (*Sup. Ct.* 1938); *Cassini v. Curtis Candy Co.,* 113 *N. J. L.* 91, 97 (*Sup. Ct.* 1934). But *cf. Rogers v. Toni Home Permanent Co.,* 167 *Ohio St.* 244, 147 *N. E. 2d* 612 (*Sup. Ct.* 1958); 2 *Harper & James, Torts* 1603–1606 (1956).

On March 28, 1956 National filed a third-party complaint against North American asserting, in its first count, that

North American had warranted that the X-ray machine and cable were free of defects and had supervised their installation and that the plaintiff Loretta R. Sinatra had alleged that the X-ray machine and cable were defective and, in its second count, that the plaintiffs had alleged that North American had negligently manufactured, inspected and supervised the installation of the X-ray machine and cable and that as a result of North American's negligence the plaintiff Loretta R. Sinatra was allegedly injured. Even after the third party complaint was filed the plaintiffs took no formal action to enlarge their complaint and include North American as well as National. See *R. R.* 4:14–1. *Cf.* 2 *Schnitzer & Wildstein, N. J. Rules Service A IV*–345 *et seq.* (1951); 3 *Moore, Federal Practice* 401 *et seq.* (2d ed. 1948). On October 16, 1956 the matter came on for trial and testimony was taken on that day and the following day. At the close of the plaintiffs' evidence, National moved for dismissal but its motion was denied. National then presented testimony by Sam Epstein, its president, who had participated in the installation of the X-ray unit.

Mr. Epstein testified that he had been in the X-ray business for 24 years; that National had always sold and serviced X-ray equipment and supplies and was the exclusive distributor for North American; that the component parts of the X-ray unit purchased by the Hackensack Hospital had been shipped by North American directly to the hospital where it remained unassembled for months and that ultimately it was assembled and installed by him and National's servicemen under the supervision of a representative of North American. Mr. Epstein testified further that the cable was not originally attached to the machine and that when National's servicemen plugged the cable into its proper terminals there was no test made of the cable because "there was no need for it." Later he testified that "the cable was tested thoroughly electrically before it was put into operation" and at other times he testified that he had made "a cursory examination" of the cable and had not made a thorough inspection of each component part of the

X-ray unit before it was assembled. There was no expert testimony as to general trade standards in the assemblage and installation of X-ray equipment nor was there any testimony as to the electrical or other facilities which were available to National for more extensive examination of the cable.

After Mrs. Sinatra had suffered her injury, one of National's servicemen picked up the cable and brought it to National's shop for inspection. Mr. Epstein examined it cursorily and testified that the cable had punctured, that there was "soot, carbonization of some sort" on the outside, that his impression was that the cable had punctured "due to a defect in the insulating material," and that the puncture had occurred not by some outside force but "from the inside out by the high current voltage." Under cross-examination by counsel for North American, he stated that a defect in insulating material would not necessarily appear when the full voltage was put on "because an inherent defect could get worse and worse with use and then finally puncture." Mr. Pans, manager of North American's medical and dental department, testified that all high tension cables are tested by North American at its plant and that its records indicated that the cable sold to National for use in the unit delivered to the Hackensack Hospital had been picked up by National at North American's plant. At the close of the testimony on behalf of all of the parties counsel summed up to the jury. Counsel for North American indicated that he thought that Mrs. Sinatra should recover but expressed the view that the recovery should be against National and not North American because the evidence established negligence by National but not North American. Counsel for National denied negligence on its part and urged that the fault was that of North American. Counsel for the plaintiffs contended that National was exclusively at fault and that the plaintiffs were entitled to full judgment against it.

The trial court rejected various requested charges submitted by National, including (1) a charge that National could not be held liable for defects in the cable due to

North American's negligence unless it "knew or should have known by a reasonable inspection or testing of the defective cable," and (2) a charge that National could not be held liable for any defects in the cable "which were not discoverable" by National after the cable came into its possession. It granted National's requested charge that if the jury found National liable to the plaintiffs then it must find North American liable to National for such sums as National is liable to the plaintiffs "where the defendant, North American Philip's, supervised the installation of this cable and there was a defect in such cable which caused it to burn." In response to an inquiry from the jury as to whether both defendants could be held "equally liable," the trial court stated that if the jury found for the plaintiffs against National it should "take into consideration" National's case against North American. The jury returned a verdict of $2,200 in favor of the plaintiffs against National and a verdict of $1,100 in favor of National against North American.

North American did not appeal, but on National's appeal from (1) the judgment in favor of the plaintiffs and (2) the amount of the judgment against North American, the Appellate Division reversed on the ground that there was insufficient evidence of negligence on National's part. In the course of its opinion it stated that, in view of the reversal, North American should have leave to move in the trial court for vacation of the judgment rendered against it. See *R. R.* 4:62–2. Thereafter the plaintiffs and North American filed petitions for certification which were granted with direction that the parties brief and argue the additional question of whether the plaintiffs have a cause of action against North American as well as the cause of action formally asserted in their complaint against National. After argument the parties were directed to submit supplemental briefs which were filed in due course.

 The principles governing the tort responsibilities of manufacturers and other suppliers of chattels have been fully expressed in our cases and we need but consider their

applicability here. See *O'Donnell v. Asplundh Tree Expert Co.*, 13 *N. J.* 319, 328 (1953); *Martin v. Bengue, Inc.*, 25 *N. J.* 359, 371 (1957); *M. Dietz & Sons, Inc., v. Miller*, 43 *N. J. Super.* 334, 338 (*App. Div.* 1957); *Nathan v. Electriglas Corp.*, 37 *N. J. Super.* 494, 498 (*App. Div.* 1955). *Cf.* 2 *Harper & James, supra*, 1535 *et seq.; Prosser, Torts* 497 *et seq.* (*2d ed.* 1955). Under the governing principles, there is no doubt that within their respective spheres of operation the manufacturer North American and the distributor National owed the duty of exercising reasonable care to avoid unreasonable risk of harm to the plaintiffs; consequently, Mrs. Sinatra and her husband could properly assert claims against both North American, for its own alleged negligence in connection with its manufacture, distribution and assemblage of the X-ray unit, and National, for its own alleged negligence in connection with its sale, assemblage and service. The responsibility of North American as the manufacturer clearly included the inspection duty of locating latent as well as patent defects which could be ascertained by the exercise of reasonable care on its part. And while there have been differing views as to the proper scope of the ordinary vendor's obligation to inspect (compare *Eldridge, Modern Tort Problems* 269 (1941), with 2 *Harper & James, supra*, 1597) we are satisfied that here National, as the exclusive distributor which actually assembled, installed and serviced the X-ray unit, also had an inspection duty of locating defects which could be ascertained by the exercise of reasonable care on its part. It may well be that the distributor's exercise of reasonable care would not disclose defects which the manufacturer's exercise of due care in the light of its own situation would have disclosed. Nevertheless, the overriding principle of due care is applicable to both and, as was noted in *O'Donnell v. Asplundh Tree Expert Co., supra*, 13 *N. J.*, at *page* 336, there is "no hard and fast rule as to latent defects" and "what is reasonable care depends upon all the facts of the case."

In the *O'Donnell* case the plaintiff, a tree clearance man employed by the East Orange Shade Tree Commission, was

injured when the metal hook attached to his safety belt snapped. He instituted action against the defendant, the Asplundh Tree Expert Company, which had sold the hook to the Commission. The Appellate Division held that the defendant, as a vendor other than the manufacturer of the hook, had not failed to discharge its responsibility to the plaintiff. On appeal, this court reversed on the finding that a jury question had been presented as to whether the defendant had exercised reasonable care in the circumstances. In response to the defendant's contention that its duty did not extend to the discovery of a latent defect, this court quoted with approval Justice Trenchard's remark in *Stassett v. Taylor Iron & Steel Co.*, 82 *N. J. L.* 631, 632 (*E. & A.* 1912), that when inspection is required the examination must be such "as a reasonably prudent man would deem necessary under the same circumstances for the discovery of possible defects, and he is not required, unless put upon notice as to possible existence of defects, to employ unusual or extraordinary tests." See also 13 *N. J.*, at *page* 337, where Chief Justice Vanderbilt said:

"The test is whether on the facts of the particular case reasonable care would discover the latent defect, *Bauman v. Cowdin*, 75 *N. J. L.* 193, 196 (*Sup. Ct.* 1907), affirmed 76 *N. J. L.* 575 (*E. & A.* 1908) ; *Barrett v. Young*, 78 *N. J. L.* 733, 736 (*E. & A.* 1910). And in determining the amount of inspection necessary the dangerous propensities of the article involved are, of course, to be considered, *Hopper v. Charles Cooper & Co.*, 104 *N. J. L.* 93 (*E. & A.* 1927) ; *Herz v. DuPont de Nemours & Co.*, 99 *N. J. L.* 407 (*E. & A.* 1924)."

*Cf. M. Dietz & Sons, Inc., v. Miller, supra,* 43 *N. J. Super.*, at *page* 338; *Garvey v. A. I. Namm,* 136 *App. Div.* 815, 121 *N. Y. S.* 442 (1910) ; *Ebbert v. Philadelphia Electric Co.,* 330 *Pa.* 257, 198 *A.* 323 (1938) ; *Sicard v. Kremer,* 133 *Ohio St.* 291, 13 *N. E.* 2d 250 (1938) ; *Sieracki v. Seas Shipping Co.,* 57 *F. Supp.* 724, 729 (*D. C. E. D. Pa.* 1944) ; *International Harvester Co. v. Sharoff,* 202 *F.* 2d 52 (10 *Cir.* 1953).

■■■ In the instant matter the Appellate Division concluded that there was an insufficient showing of negligence

on National's part because the defective cable could not be detected by visual inspection but only by electrical tests and National had "performed such tests by the only means available to it." It is not at all clear from the record before us that this was so, although we shall not pursue the matter since we are satisfied that, in any event, there were errors calling for a new trial and the evidence introduced at the new trial will presumably be sufficiently clarifying. The trial court should have charged, substantially as requested, that National is not to be held liable for defects in the cable due to North American's negligence unless National "knew or should have known by a reasonable inspection or testing of the defective cable." Furthermore the jury's verdict under which the plaintiffs were awarded $2,200 against National and National was awarded $1,100 against North American represented the jury's effort to hold each defendant responsible to the extent of half the damages suffered by the plaintiffs, and this was not in conformance with the evidence or the trial court's charge. Since there is to be a new trial on the plaintiffs' complaint, it should include all of the issues raised by the third party complaint and to that end the judgment in favor of National and against North American (which was appealed from by National insofar as its amount was concerned) is hereby set aside *in toto*.

 The remaining question is whether at the new trial the plaintiffs may assert their negligence claim not only against National but also against North American. The plaintiffs might have joined North American as a party defendant when they filed their complaint on May 10, 1955 although service in New Jersey may then have been unobtainable; the records of the Secretary of State indicate that North American was authorized to do business in New Jersey on January 16, 1956. When National filed its third-party complaint on March 28, 1956 the plaintiffs might have amended their complaint and asserted their claim against North American. See *R. R.* 4:14–1; 2 *Schnitzer & Wildstein, supra, A IV*–345, 357; 3 *Moore, supra,* 401, 440.

In fact, however, the plaintiffs did not formally assert their claim against North American until they did so in this court on November 20, 1957. At that time they urged in their brief that they have a cause of action against North American and that final judgment may be entered on their behalf. Under liberal procedural concepts their brief may be viewed as encompassing an application for appropriate amendment of their complaint, and since the cause is being remanded to the trial court the plaintiffs may there renew the application so that all phases of the controversy may be dealt with in a single proceeding. We need not at this time pass on any defense of limitations which North American might choose to raise for it may, in any event, be unavailable if the plaintiffs' amendment is related back. See *R. R.* 4:15–3. While there may be question as to whether it is to be related back to the filing of the original complaint (compare *Coventry v. Barrington,* 117 *N. J. L.* 217 (*E. & A.* 1936) and *Markey v. Robert Hall Clothes of Paterson,* 27 *N. J. Super.* 417 (*Cty. Ct.* 1953) with *King v. Solomon,* 323 *Mass.* 326, 81 *N. E. 2d* 838, 8 *A. L. R. 2d* 1 (*Sup. Jud. Ct.* 1948)), there would appear to be no just basis for doubting that it is to be related back at least to November 20, 1957 (which may be within time in view of *N. J. S.* 2A:14–22) when the plaintiffs first formally asserted their claim against North American.

The judgment of the Appellate Division is modified, with direction for a new trial.

*For modification*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, JACOBS, FRANCIS and PROCTOR—6.

*For affirmance*—Justice BURLING—1.